840 A.2d 901 (2004)
366 N.J. Super. 141
NEW YORK SMSA LTD d/b/a Bell Atlantic Mobile (now Verizon Wireless); Smart SMR of New York, Inc. d/b/a Nextel Communications, (now Nextel Communications, Inc.); Sprint Spectrum L.P.; and Omnipoint Communications, Inc. (now a wholly owned subsidiary of Voicestream Wireless), Plaintiffs-Appellants,
v.
TOWNSHIP OF MENDHAM ZONING BOARD OF ADJUSTMENT, Defendant-Respondent, and
Mayor and Council of the Township of Mendham and the Township of Mendham, Defendants, and
Francis Wood and David Hinckley, Defendants/Intervenors-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued October 21, 2003.
Decided January 29, 2004.
*903 Gregory J. Czura, Ringwood, argued the cause for appellants (Czura Stilwell, attorneys; Mr. Czura, on the brief).
John M. Mills, III, Morristown, argued the cause for respondent Township of Mendham Zoning Board of Adjustment (Mills & Mills, attorneys; Mr. Mills, on the brief).
Barry H. Evenchick, Newark, argued the cause for respondents Francis Wood and David Hinckley (Walder, Hayden & Brogan, attorneys; Mr. Evenchick and *904 Matthew D. Mandel, of counsel and on the brief).
Before Judges PRESSLER, CIANCIA and PARKER.
*902 The opinion of the court was delivered by PARKER, J.A.D.
Plaintiffs, members of a partnership of wireless communications service providers,[1] appeal from a Law Division judgment affirming the denial of their application for zoning variances to construct a 148-foot wireless communications tower on residential property in Mendham Township (Township). The variance application, which was filed jointly by plaintiffs and non-party AT & T Wireless, is unusual in that all five wireless communications service providers operating in northern New Jersey collaborated in the single site proposal. Following thirty-one hearings over the course of three years, the Township of Mendham Zoning Board of Adjustment (Board) found that the proposed tower was not particularly suited to the site and that its negative impact on aesthetics and property values would be detrimental to the public good.
The issue before us is whether the Board's action violated the Federal Telecommunications Act (TCA), 47 U.S.C.A. § 332(c)(7)(B)(i)(II), which limits the authority of local zoning boards to render decisions that effectively prohibit wireless communications services. We conclude that it did and we reverse.

I
The application process began on March 27, 1998, when the five wireless communications providers jointly filed an application for use and bulk variances to construct the tower at a site near Route 24 and Conifer Drive. On May 10, 2001, the Board voted unanimously to deny the variance and memorialized the decision in a resolution adopted on July 12, 2001.
On August 28, 2001, plaintiffs filed an action in lieu of prerogative writs in the Superior Court, Law Division, alleging that the Board's decision was not based upon substantial evidence, was contrary to established principles of state municipal land use law and violated the TCA. Plaintiffs further sought to have the Township's wireless ordinance declared null and void on the ground that it violated state and federal anti-trust law.
The matter was tried on March 14, 2002, and the trial judge rendered an oral decision on March 27, 2002.[2] Final judgment was entered on April 7, 2002, declaring the Township's wireless ordinance to be invalid[3] but upholding the Board's resolution. The trial judge nevertheless allowed plaintiffs to make an application to re-open the matter "[i]n the event all or... a substantial number of the plaintiffs in this matter are unable to workout [sic] or resolve the telecommunications issues presented in this case, within one year."
Plaintiffs are all licensed by the Federal Communications Commission (FCC) to *905 provide wireless communication services in northern New Jersey.[4] Even though they have different operating characteristics and technical needs, they all provide essentially the same cell phone service to their customers. In order to do so, each carrier must construct and maintain a system of overlapping "cell sites" throughout its coverage area. See generally, Sprint Spectrum, L.P. v. Bor. of Upper Saddle River Zoning Bd. of Adjustment, 352 N.J.Super. 575, 581-82, 801 A.2d 336 (2002) (describing the design of wireless communications systems); Stephanie E. Niehaus, Bridging the (Significant) Gap: To What Extent Does the Telecommunications Act of 1996 Contemplate Seamless Service?, 77 Notre Dame L.Rev. 641 (2002) (explaining the technical aspects of wireless communications services). The goal of each carrier is to provide its customers with readily available, landline-quality cell service.
Mendham Township is a rural community, approximately twenty-one square miles in area, located along Route 24 in Morris County. It enjoys rolling, wooded topography and two historic districts listed on the National Register. With the exception of a very small commercial zone in one of the historic areas, the entire Township is zoned for residential use. Of the approximately 13,440 acres of land in the Township, only four are zoned for non-residential use.
In July 1998, the Township adopted a zoning ordinance to regulate the siting of wireless communications facilities. The ordinance permitted telecommunications towers and antennas only as conditional uses on municipally owned property or on property owned by a public utility company and mandated tower users to co-locate their antennas wherever technically, practically and economically feasible. The ordinance was intended to protect residential areas from the potentially adverse impacts of cell towers, minimize the total number of towers throughout the community, and require cell towers to be located on nonresidential property.
After extensive research and testing, the carriers selected the Conifer Drive site as a suitable location for the cell tower and applied for the necessary variances. They intended to make the monopole available to the Township at no cost for the location of emergency services communications equipment.
In applying for site plan approval and variances from local zoning ordinances, wireless communication carriers operating under the TCA must demonstrate that (1) there is an existing, significant gap in service within the municipality; (2) their proposal will fill the gap in the least intrusive manner; (3) they have made good faith efforts to investigate alternate technologies and alternate sites which may be less intrusive in the community; and (4) the area is not already being served by another wireless provider. Sprint Spectrum, L.P., supra, 352 N.J.Super. at 604, 609-10, 801 A.2d 336. Plaintiffs established each of the Sprint Spectrum criteria.

A. Gaps In Service Within The Township

Ilias Zervos testified as an expert in radio frequency engineering on behalf of *906 Bell Atlantic. He identified active cell sites in the vicinity, noting the Bell Tower site in Mendham Borough (Mendham 1), the Headquarters Plaza site in Morristown, and a temporary site located on a building in Lewis Morris County Park (300 Mendham Road).
Zervos explained that he evaluated Bell Atlantic's existing level of coverage by conducting drive tests in the Township. In a drive test, a specially equipped vehicle travels throughout an area scanning and recording signal strengths over a given frequency range. The data obtained from the drive test is then processed by a computer and plotted in the form of a propagation map. The propagation map showed several gaps in Bell Atlantic's coverage in the eastern portion of the Township. The weakest coverage lay in a roughly circular area approximately four miles in diameter along Route 24. Another coverage gap was identified along Main Street in the Brookside section of the township.
Sean Coakley, a radio frequency engineer from AT & T Wireless, testified that his company needed additional coverage in the Township. He introduced propagation maps, verified by drive test data, showing a gap in AT & T's coverage along the Route 24 corridor between Mendham Borough and Morristown.
Paul Grunwald, Sprint's radio frequency engineer, testified that Sprint's location at Mendham 1 did not provide adequate service for the entire Township. His propagation map showed a one-mile gap in Sprint's coverage along Route 24.
Christopher Olson, Omnipoint's expert, testified that Omnipoint did not have the same level of coverage as the other carriers because it was a new company in the early phase of its build-out. Much of Olson's testimony concerned Omnipoint's planned facilities and projected coverage levels.
J. Christopher Fagas testified as Nextel's radio frequency engineer. He presented a propagation map showing a threemile gap in service straddling Route 24 between Mendham Borough and Morristown.
Robert W. Willis was the Board's radio frequency engineering expert during most of the hearings. He reviewed the carriers' propagation studies, did independent drive tests and concluded that the carriers were basically correct in their identification of coverage gaps. He agreed that there was a particular problem along Route 24 east of the border with Mendham Borough and along Main Street in Brookside. He verified that there were some spots within these areas where a non-moving user could make a call, but the signals were very weak and the tone quality was poor.
Willis resigned as the Board's expert on November 9, 2000, because of a conflict of interest. The Board then retained Clarence M. Beverage as its radio frequency engineering expert. After reviewing testimony from previous hearings and examining the carriers' propagation maps, Beverage conducted his own study based entirely upon computer propagation models. Beverage concurred with all of the other experts as to the gaps in service. In fact, Beverage's computer model predicted even poorer coverage along Route 24 than that reported by the carriers.

B. Site Selection

The proposed site for the cell tower was located at the top of a 580-foot knoll near the center of the Route 24 coverage gap, on a 10.23 acre, privately owned lot, 255 feet wide by 1760 feet deep, in a sparsely populated R-1 zone. The property, which is heavily wooded and improved with a single-family residence, fronts on Route 24, but has ingress and egress through a *907 gravel driveway connecting to Conifer Drive. Lower elevation residential lots surround the property.
The facility, as originally proposed, consisted of a 140-foot galvanized steel monopole holding five antenna arrays, topped with an eight-foot lightning rod. Unstaffed equipment shelters and cabinets would be installed at the base of the pole and connected to existing underground electric and telephone lines. The facility, covering 6,700 square feet, would be surrounded by an eight-foot chain-link fence. Two dry wells would be constructed on the site to prevent an increase in runoff and the gravel driveway from Conifer Drive would be widened from twelve to twenty-four feet.
In response to comments from members of the public, the carriers revised the site plan changing the monopole to a 140-foot "tree" designed to resemble a white pine, with branches extending down beneath the existing tree cover; placing all equipment shelters and cabinets in a single building made to look like a barn; reducing the size of the facility to 4,600 square feet; surrounding it with an eight-foot board-on-board fence; and reducing the driveway to twenty feet with forty-three ten-foot evergreens planted along the edges for screening.
The facility was to be located sixty-eight feet from the east property line, eighty-five feet from the west property line, 1030 feet from the south property line, 600 feet from the north property line, and seventy-five feet from the property owner's residence. The nearest neighboring residence would be 135 feet from the fence and 200 feet from the monopole. Because the distances to the east and west property lines did not satisfy the minimum set back requirements under the ordinance, plaintiffs applied for bulk variances in addition to the use variance required to locate the site on residential property not owned by the Township or a utility company.
Susan Gruel, a licensed professional planner, testified as an expert for the carriers that the proposed location was an "unbelievably opportune site" in that it allowed all five carriers to co-locate and fill their gaps in coverage through the construction of a single tower. She explained that a cell site is a passive use that does not burden its surroundings with noise, lighting, pollution, traffic or additional population. While every cell tower has a visual impact, the mature vegetation in the area would minimize that effect. She further opined that the topography of the site would mitigate the tower's visual impact on surrounding neighborhoods. After assessing the visibility of a 148 foot crane placed on the Conifer Drive property, Gruel concluded that the tower would not present a "prominent and continuous" visual obstruction.
Richard T. Coppola, a licensed professional planner retained by the Board, disagreed with Gruel and stated that the tower would be clearly visible from many vantage points throughout the Township, including surrounding neighborhoods and the historic districts. He agreed that the proposal to camouflage the monopole as a tree was better than a steel pole, but he believed nothing could mitigate the tower's detrimental aesthetic effects.
The radio frequency engineers all agreed that the Conifer Drive site was an ideal location to solve service problems in the Township. Willis, the Board's first engineering expert, agreed that the Conifer Drive site was ideally situated to provide good connecting coverage for the carriers because a large portion of the Township is in a valley, walled by steep hills, with the knoll at Conifer Drive being the highest point in the valley's center. Locating the facility atop the knoll would provide the *908 coverage needed by all five carriers within the valley. If the facility were placed elsewhereeither on one of the valley walls or the valley floorthe Conifer Drive knoll would obstruct the signal and create coverage shadows in the opposing portions of the valley. Willis conceded that Conifer Drive would allow signals to reach into all parts of the valley and, if other sites were used, Conifer Drive would shadow portions of the valley from whatever site was used.
Beverage, the Board's second engineering expert, testified that the Conifer Drive site would provide a "rock solid" signal along Route 24 and that the topography of the Township made it the best spot in the valley for filling the gap in existing services. He concluded that "[i]f I were the applicant, I would say the [Conifer Drive] site [was] unique because ... it's the site that would provide the best coverage."

C. Alternate Sites

The identification and evaluation of alternate sites for a wireless communications facility occupied more time and attention than any other issue at the hearings. The Township provided the carriers with a list of thirty-three properties owned either by the municipality or a public utility where cell towers were permitted as a conditional use under the ordinance. The Township, however, did not offer to lease any of its properties to the carriers and resisted the carriers' repeated efforts to ascertain the availability of the sites. Nevertheless, each applicant fully investigated each potential site on the Township's list of thirty-three, and each of their experts testified as to why each site was not a suitable alternative to Conifer Drive. Finally, on August 31, 2000, after more than two years of hearings, the Township notified the carriers that one of the properties would be made available for a wireless communications facility. All of the experts testified that this single site was similarly unsuitable.
Willis agreed that the carriers' evaluations of the municipal sites were reasonable, stating that "[n]ot one of the municipal sites with a tower that meets the ordinance requirements would provide the same coverage they can get from Conifer Drive." Beverage concurred.
Other sites suggested during the course of the hearings included locations at the Delbarton School, a water tower on Horizon Drive, a park office at 300 Mendham Road, and a hilltop at Dismal Harmony. Each of these sites was also examined by the carriers' experts and rejected as an inadequate substitute for the Conifer Drive site. The Board's experts agreed.
Both of the Board's experts identified a specific hilltop in Lewis Morris County Park (LM-1) as an adequate substitute for the Conifer Drive site. Willis testified that LM-1 would provide continuous coverage along Route 24 and would handoff to Mendham 1 and Headquarters Plaza. The intervening effect of the Conifer Drive knoll, however, would result in a "basic shadow" in coverage around the municipal buildings on Main Street. He nevertheless concluded that LM-1 was a "good second-best" alternative to the Conifer Drive site. The carriers' experts testified that, while LM-1 was better than any other alternate site, it still left coverage gaps along Main Street that would need to be filled by other means.
LM-1 is situated on a 580-foot hill directly behind a new residential development on the Indian Hollow Road cul-de-sac. In order to access the site, the carriers would have to build a road between two existing houses. The terrain behind the houses is steeply sloped and transversed by a stream, requiring the access road to be built over a twenty percent downslope and across the stream in order *909 to connect LM-1 with Indian Hollow Road. Alternatively, the entire area would have to be regraded to switch-back the road down the slope.
Gruel presented the Board with photographs of the uneven terrain between LM-1 and the Indian Hollow Road cul-de-sac. She concluded that from a visual perspective, LM-1 was even more intrusive than Conifer Drive and its use would require the construction of additional structures in the vicinity of Main Street. Moreover, LM-1 is subject to Green Acres restrictions.
Quentin Schlieder, Secretary/Director of the Morris County Park Commission, testified that Lewis Morris County Park lies within three municipalitiesMendham, Morris and Harding Townships. Before any telecommunications structure could be constructed in the park, all three municipalities would have to approve the project.

D. Alternate Technologies

Willis claimed that although a tower at the Conifer Drive site would close the carriers' gaps in coverage, the same result could be achieved through the construction of towers at two or three alternate sites combined with the deployment of alternate technology in the form of cell repeaters or microcells. The carriers' experts countered Willis' claims, testifying at length that cell repeaters and microcells were not feasible alternatives to the Conifer Drive site. Beverage agreed with the carriers' engineering experts that neither repeaters nor microcell technology would meet the coverage needs of the Township.

E. Miscellaneous Considerations

Janet Foster, an expert in historic preservation, testified on behalf of the carriers that the tower would not be visible from the historic areas due to the Township's "very focused and inward-looking" streets where "you do not get big vistas and views." Foster testified further that federal regulations preempted the Board from denying the applicants' variance request based upon any impact the tower might have on the historic districts. See 27 C.F.R. 1.1304(a)(4), promulgated to implement the 1996 National Environmental Policy Act, 42 U.S.C.A. §§ 4321-4370.
There was extensive public participation at the hearings. Many people spoke at length in opposition to the proposal, expressing concern about aesthetics, property values and safety issues.[5]

II
Following the hearings, the Board denied the application. The resolution recited selected portions of testimony and concluded that the carriers failed to demonstrate that the proposed facility would benefit the public because:
A. Evidence of a lack of special reasons to support the application is found in the fact that even if the site were constructed at the Barsa property in Conifer Drive, there would still remain some gaps in coverage and in point of fact, there is and never has been any type of master plan or long range plan which would enable the Municipality to, in a meaningful fashion, address the siting of *910 the proposed facilities and coverage gaps.
B. The proposed site for the tower, while adequate to meet the needs of the applicant is not unique or so particularly suited that it should be considered to the exclusion of other sites having a less significant impact on the community. Sites which would approach the coverage objectives of the applicant but which would be far less obtrusive to the community were either inadequately explored or ignored. Specifically, no application was pursued with respect to a location in Lewis Morris Park and, but not by way of limitation, the applicants steadfastly refused to give any meaningful consideration to the permitted location on Horizon Drive.
C. There is no hard data that exists from a customer perspective on the need to improve service coverage in this area. The Board heard no testimony relative to customer complaints about service in the Route 24 corridor.
D. It is clear from the language of the Ordinance which permits telecommunications towers and antennae as conditional uses on Municipally owned property and property owned by public utility water companies that it was the intention of the Ordinance that structures of this nature not be associated with residential uses.
The Board denied the variance application for the following reasons:
1. Aesthetically, the proposed cellular tower at 148 feet to be disguised as a proposed evergreen tree will dominate the skyline and tower over the existing 60 to 70 foot high tree canopy. The proposed facility will be highly visible from many vantage points in and about the Brookside and Washington Valley Historic Districts and from in and about other areas of Mendham Township as well.
2. There is ample evidence that there will be a negative impact on property values associated with the construction of this tower in this existing residential neighborhood.
3. There are demonstrable concerns about odors from generators, noise, traffic, degradation of the environment and destruction of mature trees which will result from the construction of this facility at the proposed site.
4. Several of the residences, specifically, the Barsa residence, the Wood-Hinckley residence and the Wall residence are far too close to the tower to in any way represent an acceptable situation.
5. Since the Barsa property [Conifer Drive site] already supports a legitimate and lawful residential use, the proposed use by the applicant would represent two principal uses on a single site.
6. The Historic Preservation Office of the State of New Jersey Department of Environmental Protection has determined that the proposed wireless communication equipment will have an adverse effect on the Washington Valley Historic District and the Brookside Historic District.
7. With respect to the ten goals of Ordinance 7-98 (the cellular tower Ordinance), the proposed application is directly contrary to eight of those ten goals.
Plaintiffs filed an action in lieu of prerogative writs, appealing the Board's decision. The Law Division judge determined that the Board erred in finding no need for a tower in the Township. He noted that Route 24 is a major arterial road running through Morris County and the carriers presented compelling proofs of a need for telecommunications coverage *911 along that road. He was satisfied that the carriers adequately proved that the proposed Conifer Drive site was suitable for a communications tower.
The judge then considered the natural beauty of the area, and stated: "I think it's an extraordinarily close call as to whether the communications good that would result [from the construction of a tower] is outweighed or not by the aesthetic downside." Observing that courts should defer to local boards on such issues, the judge concluded that there was substantial evidence in the record to support the Board's denial of the variance application.
He nevertheless recognized that the significant communications gap in the Township required construction of some type of telecommunications facility:
I have to say I'm disturbed.... I think what's done is acceptable. But it's just acceptable. Barely acceptable.... [T]hese companies have spent three years putting this case through. They [didn't] get anyplace. You come to realize that after a while the processing can... knock people out of the box.... The difficulty of processing and the cost of processing gets to be a form of prohibition, aside from the substance of the decisions.
The trial judge entered final judgment but allowed for plaintiffs to re-open the case in a year because the "requirements of federal law that there not be a prohibition are very close to being breached in eastern Mendham Township. And we're not going to let them be breached. It's an important national policy." Plaintiffs appealed.

III
Plaintiffs argue that the Board's denial of their application and the trial court's affirmance thereof constituted an effective prohibition of wireless service, in violation of the TCA, 47 U.S.C.A. § 332(c)(7)(B)(i)(II). They contend that the principles articulated in Sprint Spectrum L.P. require the Board to grant their application once they established that there was a significant gap in service and that their proposal was the least intrusive means of closing that gap. They further claim that the trial judge erroneously applied a deferential standard rather than a de novo review.
The Board responds that the TCA preserves the authority of local boards to regulate the siting of telecommunications facilities and de novo review is not, therefore, appropriate in this case. Notwithstanding their own experts' testimony to the contrary, the Board maintains that there is no significant gap in telecommunications coverage in the Township and that its decision does not effectively prohibit wireless communications services.[6]
The Board relies on two recent federal cases that we deem irrelevant to this appeal. ATC Realty, LLC v. Town of Kingston, 303 F.3d 91 (1st Cir.2002), did not involve a claim of effective prohibition, because the local zoning authority had previously granted permission to a different tower developer to build a site that would close the gap in local service. Id. at 95. Similarly, in Southwestern Bell Mobile Systems, Inc. v. Todd, 244 F.3d 51 (1st Cir.2001), the carrier specifically conceded that denial of its application did not constitute *912 an effective prohibition of telecommunications services. Id. at 63.
The Board fails to differentiate between a claim brought pursuant to 47 U.S.C.A. § 332(c)(7)(B)(iii), which requires that decisions of local boards be in writing and be supported by substantial evidence in the record, and a claim brought pursuant to 47 U.S.C.A. § 332(c)(7)(B)(i)(II), which proscribes the effective prohibition of personal wireless services.[7] While determinations under § 332(c)(7)(B)(iii) are reviewed under the substantial credible evidence standard, claims of effective prohibition under § 332(c)(7)(B)(i)(II) are reviewed de novo. Nextel of N.Y., Inc. v. Bor. of Englewood Cliffs Bd. of Adjustment, 361 N.J.Super. 22, 44, 824 A.2d 198 (App.Div.2003).
The intervenors concede that de novo review is the proper standard, but they contend that the trial court applied that standard in rejecting plaintiffs' arguments. They claim that the carriers failed to make "thorough and genuine efforts to explore the potential of locating their equipment on any alternative site."

A. Standard of Review

We have previously held that the TCA, 47 U.S.C.A. § 332(c)(7)(B)(i)(II), preempts any State statute or local ordinance that effectively prohibits personal wireless services. Sprint Spectrum L.P., supra, 352 N.J.Super. at 601, 801 A.2d 336. We directed the trial courts to apply "a de novo review that is not necessarily limited to the record compiled by the local authority." Id. at 602, 801 A.2d 336 (citing APT Pittsburgh Ltd. P'ship v. Penn Tp., 196 F.3d 469, 475 (3d Cir.1999); Town of Amherst v. Omnipoint Communications Enters., Inc., 173 F.3d 9, 16 (1st Cir.1999)).
We further noted that the de novo standard applies equally to appellate review, with no deference afforded to the trial court's factual findings:
We review the record de novo in order to decide whether plaintiffs proved that there is a significant gap in the ability of remote users to access the national telephone network. In making that determination, we consider whether plaintiffs proved that the area is not already being served by another wireless communications provider. Further, we must decide whether plaintiffs proved that the proposed facility is the least intrusive means to close the gap in service. In so doing, we also consider whether plaintiffs made a good faith effort to identify and evaluate less intrusive alternatives.
[Sprint Spectrum, supra, 352 N.J.Super. at 609-10, 801 A.2d 336 (citation omitted).]
The de novo standard applies to this appeal, and we have reviewed the record accordingly.

B. Significant Gap In Service

Plaintiffs next argue that they presented undisputed evidence of a significant gap in wireless service in the Township and that the trial judge was correct in concluding that there was a need for a wireless communications facility to close the coverage gap. The Board responds that the experts testified only to the "potential" of dropping a call and the "potential" of having a "staticy" call and that such speculative remarks cannot establish a significant gap. Our de novo review of the record confirms the trial judge's finding that the providers presented "compelling proofs" of the need *913 for a communications tower in the Township and the concurrence of the Board's experts.
To establish a violation of § 332(c)(7)(B)(i)(II):
[T]he provider must show that its facility will fill an existing significant gap in the ability of remote users to access the national telephone network. In this context, the relevant gap, if any, is a gap in the service available to remote users. Not all gaps in a particular provider's service will involve a gap in the service available to remote users. The provider's showing on this issue will thus have to include evidence that the area the new facility will serve is not already served by another provider.
[Sprint Spectrum L.P., supra, 352 N.J.Super. at 604, 801 A.2d 336 (quoting APT Pittsburgh Ltd. P'ship, supra, 196 F.3d at 480).]
Although there is no bright line test for a "significant gap" in service, it cannot merely be de minimis "dead spots" in coverage within a larger service area. Ho-Ho-Kus, supra, 197 F.3d at 70 n. 2; Sprint Spectrum L.P., supra, 352 N.J.Super. at 604-05, 801 A.2d 336; see MetroPCS, Inc. v. City of San Francisco, 259 F.Supp.2d 1004, 1014 (N.D.Cal.2003) (distinguishing between a "gap" in coverage and a "dead spot"). The two basic questions in evaluating whether a carrier has established a significant gap in coverage are: (1) whether "the cellular provider established that the quality of cellular service is sufficiently poor so as to rise to the level of a `significant' gap"; and (2) whether the cellular provider established that the purported gap in service affects a significant number of users. Am. Cellular Network Co., LLC v. Upper Dublin Tp., 203 F.Supp.2d 383, 389 (E.D.Pa.2002).
All seven experts in radio frequency engineering, including the two retained by the Board, testified that there was a significant gap in the service of each provider within the Township. Indeed, the Board's experts testified that the carriers' propagation studies fairly represented signal strengths within the Township and their independent tests confirmed the gaps.
With respect to the scope of the coverage gap, the Third Circuit observed in Ho-Ho-Kus that "it matters a great deal ... whether the `gap' in service merely covers a small residential cul-de-sac or whether it straddles a significant commuter highway...." 197 F.3d at 70 n. 2. The evidence conclusively established significant gaps in two principal areas: Route 24 and Main Street. The gap straddling Route 24 ranges from one to four miles in size, depending on the carrier. Route 24 is a two-lane highway, designated as a "major arterial road" in the Township master plan. Main Street is the Township's only commercial area where the fire department, police department, community building and post office are situated. A disruption in service in either of these areas will affect a significant number of users.
Plaintiffs clearly and convincingly established the existence of a significant gap in service. Moreover, since plaintiffs represent all of the licensed wireless communications providers in northern New Jersey, another provider will not likely serve the area. The Board erred in failing to recognize the gap in service and the need to fill the gap within the Township.

C. Alternative Technologies and Sites

Plaintiffs maintain that they exhaustively considered alternate technology and alternate sites before presenting Conifer Drive as the only feasible location for the facility. We agree. There was uncontradicted expert testimony that a telecommunications *914 tower at Conifer Drive is the least intrusive means of closing the coverage gaps within the Township.
The Board claims that plaintiffs left significant unanswered questions concerning the possible use of the Lewis Morris County Park site, either alone or in combination with sites at Delbarton School or Horizon Drive. The Board's response is meritless in view of the record before us. Plaintiffs' efforts in investigating alternate sites were thorough and certainly met the "good faith effort" criteria articulated in Sprint Spectrum L.P.:
[T]he provider applicant must also show that the manner in which it proposes to fill the significant gap in service is the least intrusive on the values that the denial sought to serve. This will require a showing that a good faith effort has been made to identify and evaluate less intrusive alternatives, e.g., that the provider has considered less sensitive sites, alternative system designs, alternative tower designs, placement of antennae on existing structures, etc.
[352 N.J.Super. at 604, 801 A.2d 336 (quoting APT Pittsburgh Ltd. P'ship, supra, 196 F.3d at 480).]
Zoning boards do not have carte blanche to reject an application based on conjecture that a possible alternative site is both suitable and available. Ocean Cty. Cellular v. Lakewood Bd. of Adjustment, 352 N.J.Super. 514, 529, 800 A.2d 891 (App.Div.), certif. denied, 175 N.J. 75, 812 A.2d 1108 (2002). Requiring providers to disprove the suitability of every possible alternate site is a daunting task because of the uncertainty surrounding the availability and ultimate suitability of such sites. Ibid. Moreover, an alternate site may require the provider to file a variance application, the approval of which is far from certain. Ibid.
The trial judge found that plaintiffs presented compelling proofs of the particular suitability of Conifer Drive. He erred, however, in ordering the parties to explore the alternate possibilities and offering plaintiffs the opportunity to re-open the case after a year. The Board's own experts agreed that neither Delbarton nor Horizon Drive could provide the carriers with the coverage they need, and all of the experts agreed that a cell tower at the LM-1 site would leave coverage gaps along Main Street.
Moreover, a cell tower at LM-1 would intrude upon open space dedicated to public recreation. "Green Acres was enacted to provide lands for public recreation, the conservation of natural resources and to promote public health and welfare in light of the needs of an expanding population." In Re Amendment to Recreation & Open Space Inventory of Plainfield, 353 N.J.Super. 310, 328, 802 A.2d 581 (App.Div.2002) (citing N.J.S.A. 13:8A-36). Efforts by local authorities to convert dedicated recreational land to more profitable commercial use undermines the fundamental purposes of the Green Acres program and must be strictly examined. Id. at 329-30, 802 A.2d 581.
The record before us conclusively establishes that plaintiffs diligently investigated all reasonable alternate technologies, designs and locations. The Conifer Drive site is the least intrusive, most suitable location for the wireless facility to fill the coverage gap within the Township.
Finally, plaintiffs argue that any further attempts to investigate alternate sites or technology for a wireless communications facility in the Township would be a fruitless waste of time. We agree.
A provider need not pursue alternatives when it has established that "further reasonable attempts to build a wireless *915 communication facility to fill the gaps in service would likely be fruitless and a waste of time." Sprint Spectrum, L.P., supra, 352 N.J.Super. at 610, 801 A.2d 336. In addition to protracting the hearings over three years, the Board and Township exhibited questionable conduct during the proceedings. For example, a sitting Board member privately contacted the Chairman of the Mendham Historic Preservation Committee and urged him to appear to testify against the application. Very late in the proceedings, a cell site speculator, allegedly with financial connections to a Township resident, expressed interest in placing a facility at a location previously rejected by the experts, even though the speculator's only prospective tenants were the water utility and the Township. The Board delayed its decision on the application for months by allowing lengthy, repetitive and irrelevant testimony from the public. Counsel for the objectors appropriately characterized the Board's obvious predisposition in his closing remarks: "I would offer the observation that this application was doomed from the beginning." We are satisfied that any further efforts by plaintiffs to obtain approval to build a wireless communications facility within the Township would be fruitless.

CONCLUSION
We reverse the Board's denial of the variances and site plan approval, and we remand for the Board to grant forthwith the variance application and approve the site plan, pending successful completion of the 47 C.F.R. § 11307(a)(4) environmental assessment process.
Reversed and remanded.
NOTES
[1] The partners in the application are New York SMSA Ltd. (Bell Atlantic), Smart SMR of New York, Inc. (Nextel), Sprint Spectrum L.P. (Sprint) and Omnipoint Communications (Omnipoint).
[2] The parties at trial were plaintiffs, defendant Township, defendant Board and intervenors Francis Wood and David Hinckley. Although we were not provided with the trial court's order granting leave to intervene, it is apparent that the court granted an intervention motion on behalf of Wood and Hinckley.
[3] The Township has not appealed the trial court's judgment declaring the ordinance invalid.
[4] Bell Atlantic and AT & T Wireless are cellular providers, which means they operate at radio frequencies in the range of 800 to 900 MHz and employ both analog and digital technology. Sprint and Omnipoint are personal communications service (PCS) providers. Using broadband digital technology, they operate at higher frequencies (1800 to 1900 MHz) and lower power than the cellular companies. Nextel is a specialized mobile radio (SMR) service that provides digital radio communications. Although Nextel operates in the same frequency range as the cellular providers, its signals are propagated by use of a different type of frequency modulation.
[5] Much of the public's testimony was repetitive and irrelevant. In addition to reading extensively from transcripts of past hearings, numerous people testified concerning the dangers of using a cell phone in a moving vehicle, legislation adopted in Ohio banning the use of cell phones, vacation experiences, military service, the origins of the "DADA" movement and its effects on modern concepts of aesthetics, personal art collections and the exclusive nature of the Mendham community. Four hearings were devoted entirely to public testimony and many others were dominated by public statements and questions.
[6] The Board also argues that the matter is not ripe for appeal because the trial court incorporated the possibility of re-opening the final judgment. We reject that argument on the ground that the entry of a final judgment gives rise to plaintiffs' right to appeal. R. 2:2-3(a)(1).
[7] The Board makes the same error in relying upon selected portions of Cellular Tel. Co. v. Zoning Bd. of Adjustment of Ho-Ho-Kus, 197 F.3d 64, 76 (3d Cir.1999), to support its argument that its decision is entitled to deferential review.