**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5869-17T3

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

IBN BAILEY,

      Defendant-Appellant.

_____

Argued December 15, 2020 – Decided January 6, 2021

Before Judges Yannotti, Haas, and Mawla.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Indictment No. 15-12-1572.

Stefan Van Jura, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Stefan Van Jura, of counsel and on the brief).

Erin M. Campbell, Assistant Prosecutor, argued the cause for respondent (Esther Suarez, Hudson County Prosecutor, attorney; Erin M. Campbell, on the brief).

PER CURIAM

On December 1, 2015, a Hudson County grand jury returned a five-count indictment charging defendant Ibn Bailey with first-degree murder, N.J.S.A. 2C:11-3(a)(1) and (2) (count one); first-degree felony murder, N.J.S.A. 2C:11-3(a)(3) (count two); second-degree robbery, N.J.S.A. 2C:15-1 (count three); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count four); and second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b) (count five).

Prior to trial, defendant filed a motion to exclude the testimony of Sergeant Sean O'Leary, the State's proposed expert in cell phone data analysis. Defendant argued that O'Leary lacked the requisite qualifications to testify as an expert and that his opinion on defendant's location when he made calls near the time of the shooting was not based on a reliable method. On January 5, 2017, the trial court denied the motion. Defendant unsuccessfully challenged this ruling in a motion for reconsideration and after conducting voir dire of O'Leary at trial.

On January 16, 2018, the court granted the State's pre-trial motion to preclude defendant from introducing evidence of the victim's alleged drug dealing, which defendant claimed could establish third-party guilt. The court

A-5869-17T3

ruled that the evidence was not relevant to any material issue and was likely to confuse the jury.

Following a multi-day trial, the jury found defendant guilty of murder and the two weapons offenses, and not guilty of the remaining charges. The trial judge merged the possession of a weapon for an unlawful purpose conviction into the murder conviction, and sentenced defendant to seventy-five years in prison, subject to an eighty-five percent period of parole ineligibility pursuant to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, and five years of parole supervision upon his release. The judge sentenced defendant to a concurrent seven-year term on the unlawful possession of a weapon conviction.[1] This appeal followed.

On appeal, defendant raises the following contentions:

> POINT I
>
> DEFENDANT WAS DENIED DUE PROCESS AND A FAIR TRIAL BY THE TRIAL COURT'S INEXPLICABLE FAILURE TO CHARGE THE JURY ON IDENTIFICATION WHERE IDENTIFICATION WAS A CRUCIAL AND CONTESTED ISSUE. U.S. Const. amends. V, VI, and XIV; N.J. Const. art. I, pars. 1, 9, and 10. (Not Raised Below).

---

[1] At the time of sentencing, the judge stated she was imposing "a life sentence," and then explained that "the life sentence for the record is seventy[-]five years."

A-5869-17T3

POINT II

DEFENDANT WAS DENIED DUE PROCESS AND A FAIR TRIAL BY THE IMPROPER ADMISSION OF EXPERT TESTIMONY ON MOBILE TELECOMMUNICATIONS DATA ANALYSIS. U.S. Const. amends V, VI, and XIV; N.J. Const. art. I, pars. 1, 9, and 10.

POINT III

DEFENDANT WAS DENIED DUE PROCESS AND A FAIR TRIAL BY THE IMPROPER ADMISSION OF TESTIMONY FROM WHICH THE JURY WOULD READILY INFER THAT DEFENDANT WAS A CONVICTED FELON. U.S. Const. amends V, VI, and XIV; N.J. Const. art. I, pars. 1, 9, and 10.

POINT IV

DEFENDANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO PRESENT A COMPLETE DEFENSE BY THE TRIAL COURT'S ERRONEOUS RULING PRECLUDING REFERENCE TO THE VICTIM'S DRUG DEALING, WHICH EXPOSED THE VICTIM TO DANGER AND SUPPORTED DEFENDANT'S THIRD-PARTY GUILT DEFENSE. U.S. Const. amends V, VI, and XIV, N.J. Const. art. I, par. 1.

POINT V

THE FOUR ERRORS ASSERTED ABOVE HAD A CUMULATIVE IMPACT ON DEFENDANT'S RIGHT TO DUE PROCESS AND A FAIR TRIAL. U.S. Const. amends V, VI, and XIV, N.J. Const. art. I, pars. 1, 9, and 10.

A-5869-17T3

<u>POINT VI</u>

THE IMPOSITION OF A LIFE SENTENCE UNDER
THE CIRCUMSTANCES OF THIS PARTICULAR
MURDER IS MANIFESTLY EXCESSIVE.

After reviewing the record in light of the contentions advanced on appeal, we affirm defendant's convictions and sentence.

I.

At approximately 6:00 p.m. on March 25, 2015, a resident walking on Pacific Avenue in Jersey City saw a man "hunched over" in a car that was parked on the street. The citizen assumed the man was drunk and so he took no action at that time. However, the resident called the police when he saw that the man was still in the car at 9:00 p.m.

When the police arrived, they found the man, later identified as Karl Revis, dead from a gunshot wound to the head. The police investigation revealed there were eight fingerprints on the passenger side door handle and window. The police identified defendant as a "potential candidate" for the prints.

Detective Eric Infantes examined the call records for defendant's and Revis's cell phones. He testified that the two men exchanged a few calls and a greater number of text messages between 12:30 p.m. and 12:45 p.m. on March

A-5869-17T3

In the messages, Revis offered to pay defendant to have sex with him. According to the text messages, Revis agreed to pick defendant up in Jersey City and drive him to Revis's apartment in East Orange.

Infantes testified that a video surveillance recording obtained from Revis's apartment building showed two men, who defendant later identified as Revis and himself, entering the building and then an elevator at 1:07 p.m. In the video, Revis was wearing jeans, a green coat, and a knit cap. Defendant wore ripped blue jeans, "a black jacket with something underneath," white sneakers with black soles, and a "dark" hat with red and white horizontal stripes. The recording showed defendant and Revis leaving the building about an hour after they arrived.

According to Infantes, defendant and Revis exchanged additional phone calls and text messages between 4:14 p.m. and 4:18 p.m. O'Leary, the State's expert in cell phone data analysis, testified that these calls and texts were serviced by cell towers in Hillside. O'Leary explained that while cell phone towers could not pinpoint the exact location of a phone call when it is made and received, they did provide the general location of the phone. O'Leary opined that the "absolute maximum" distance the tower and phone would be from each

other was "[p]robably a mile and a half . . . ."[2] Thus, defendant and Revis were in the general area of Hillside during those conversations. The last call that Revis's phone made on March 25 was at 5:04 p.m., and it was serviced by a tower on Raymond Boulevard in Newark.

Lieutenant Anthony Musante processed Revis's license plate through an automated license plate reader and determined that his car traveled over a bridge into Jersey City at 5:26 p.m.

At 5:35 p.m., defendant's phone made a call that was serviced by a tower on Communipaw Avenue in Jersey City. This location was approximately a half a mile away from where Revis's body was found. At 5:55 p.m., defendant made a call that was serviced by a tower on Pacific Avenue in Jersey City, which was about a block away from the crime scene. Two minutes later, defendant made a call serviced by a tower on Garfield Avenue in Jersey City, which was about a half mile from the crime scene and, at 5:58 p.m., defendant made another call that was serviced by the tower on Pacific Avenue.

---

[2] Joseph Sierra, custodian of records for T-Mobile, testified for the State and corroborated O'Leary's testimony concerning the coverage range of cell towers. Sierra explained that the range of coverage of each tower varies by geographic area and that in urban areas where towers are located "about every two blocks," the range of coverage is also about two blocks.

According to Infantes, a video surveillance recording from a camera near the crime scene first showed Revis's car parked on Pacific Avenue between 5:35 p.m. and 5:40 p.m. At 5:50 p.m., another video showed a man walking on Forrest Street, which intersected with Pacific Avenue less than a block away from the crime scene. The man wore white sneakers with black soles, ripped blue jeans, a black jacket, and a dark-colored hat with white and red stripes. The man had something rolled up under his arm and a green item in his hand.

Moments later, another surveillance camera at the corner of Forrest Avenue and Halladay Street, which was one street over from Pacific Avenue, captured the same man walking. On another surveillance camera, the man was seen bending down behind a bush and doing something with the green item. At trial, a sidebar discussion revealed that the item in the man's hand was Revis's green jacket. When the man bent down, he rummaged through the coat and then placed something in his pocket. At approximately 6:00 p.m., a surveillance video on Garfield Street showed the man throwing something away. The police later searched the area but found nothing.

On March 27, defendant's phone accessed two news articles about the murder. One of the articles identified Revis by name and stated that the authorities believed they had identified the shooter. By the next day, defendant

8

had acquired a new phone and began advising his contacts that he had a new number.

On March 28, defendant used his new phone to contact a woman in West Virginia. In a series of text messages, he told the woman he was coming to see her. The police eventually arrested defendant in Virginia.

On May 7, 2015, Detective Sergeant Willy Caicedo interviewed defendant. After Caicedo advised him of his Miranda[3] rights, defendant agreed to speak with him. A redacted version of defendant's statement was played for the jury.

Defendant denied knowing a man named Revis. However, when Caicedo showed him a photo of Revis, defendant said it was a photo of "Bam." Defendant stated, "I sell weed to him" and he believed Bam was from East Orange or Newark. Defendant said he had been to Bam's house "[s]everal times" in relation to their drug deals.

Caicedo showed defendant the surveillance video of Revis and a man at Revis's apartment building, and defendant said the men in the video were Bam and himself. Defendant said they had gone to Bam's house to do a drug transaction, later went to Hillside to pick up Bam's car from a Nissan dealership,

---

[3] Miranda v. Arizona, 384 U.S. 436 (1966).

and then they sold drugs in Newark. Defendant stated that Bam then dropped him off in Journal Square in Jersey City, and that was the last time he saw Bam.

O'Leary testified that based on the calls defendant made between 5:55 p.m. and 5:58 p.m., defendant was not in Journal Square at the time because the calls were serviced by towers on Pacific and Garfield Avenues. According to O'Leary, Journal Square was roughly two miles away and calls do not connect to towers that far away when others are close by.

Defendant did not testify. He presented one witness, Investigator Jefferey Lundy, who testified that he had spoken to the manager of a Nissan dealership in Hillside. The manager told Lundy that Revis's car was dropped off for service on March 24, and picked up on March 25.

## II.

In Point I, defendant contends for the first time on appeal that the trial judge erred by failing to provide the "No In- Or Out-Of-Court Identification" charge to the jury. We disagree.

"[A]ppropriate and proper charges are essential for a fair trial." State v. Baum, 224 N.J. 147, 158-59 (2016) (quoting State v. Reddish, 181 N.J. 553, 613 (2004)) (internal quotations omitted). The trial court is required to give the jury "a comprehensible explanation of the questions that the jury must determine,

A-5869-17T3

including the law of the case applicable to the facts that the jury may find." Id. at 159 (quoting State v. Green, 86 N.J. 281, 287-88 (1981)). "Erroneous instructions on matters or issues that are material to the jury's deliberation are presumed to be reversible error in criminal prosecutions." State v. Jordan, 147 N.J. 409, 422 (1997) (citing State v. Warren, 104 N.J. 571, 579 (1986)). However, in assessing the propriety of the instruction, an appellate court will examine the entire charge to see whether it was ambiguous or misleading or whether it misinformed the jury of the law. State v. R.B., 183 N.J. 308, 324 (2005).

Where, as here, no objection is raised, we review the instructions for plain error and must determine whether the error was "clearly capable of producing an unjust result." State v. Alexander, 233 N.J. 132, 141-42 (2018) (citing R. 2:10-2). "The mere possibility of an unjust result is not enough." Id. at 142 (quoting State v. Funderburg, 225 N.J. 66, 79 (2016)). "Rather, '[t]he possibility must be real, one sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." Ibid. (quoting State v. Macon, 57 N.J. 325, 336 (1971)).

Applying these standards, we are satisfied that defendant's argument lacks merit. The "No In- Or Out-Of-Court Identification" charge provides:

11

(Defendant), as part of his/her general denial of guilt, contends that the State has not presented sufficient reliable evidence to establish beyond a reasonable doubt that he/she is the person who committed the alleged offense. The burden of proving the identity of the person who committed the crime is upon the State. For you to find this defendant guilty, the State must prove beyond a reasonable doubt that this defendant is the person who committed the crime. The defendant has neither the burden nor the duty to show that the crime, if committed, was committed by someone else, or to prove the identity of that other person. You must determine, therefore, not only whether the State has proven each and every element of the offense charged beyond a reasonable doubt, but also whether the State has proven beyond a reasonable doubt that this defendant is the person who committed it.

[Model Jury Charge (Criminal), "Identification: No In- Or Out-of-Court Identification" (approved Oct. 26, 2015).]

A footnote to the instruction states that the charge should be given when the State relies solely on circumstantial evidence to prove defendant's identity "without adducing any direct identification evidence." Ibid.

In this case, the instruction was not applicable because the State produced direct identification evidence, namely, a number of surveillance recordings before and after the murder which showed a man wearing ripped blue jeans, white sneakers with black soles, a black jacket, and a dark hat with red and white stripes. Defendant identified himself as the man wearing these clothes in the

12

surveillance recording obtained from Revis's apartment building. The man in the other videos wore the same set of clothes. Thus, this was not a case where the State relied solely upon circumstantial evidence to establish defendant's identity.

In addition, the judge's final charge to the jury specifically stated that the State had the burden of proving that defendant committed each element of each crime beyond a reasonable doubt and that this burden never shifted to defendant. The judge also instructed that defendant claimed someone else had killed Revis and that he had no burden of proof, including no burden of showing that someone else committed the crime. Thus, the charge as a whole adequately conveyed the law applicable to the issues the jury had to resolve.

Therefore, we reject defendant's contention on this point.

### III.

In Point II, defendant contends the trial judge erred in permitting O'Leary to testify that defendant could not have made the calls from Journal Square because it was roughly two miles away from the towers used to transmit the calls, and towers in urban areas generally did not service calls greater than one-and-a-half miles away. Defendant argues that O'Leary lacked the qualifications to offer expert testimony on the frequency range of the towers to which

defendant's calls connected. Defendant also asserts that because O'Leary did not base his opinion on "drive test data," which defendant alleges is the most reliable method, the expert's testimony should have been barred. We disagree with these contentions.

We first address defendant's arguments concerning O'Leary's qualifications as an expert. Our "courts take a liberal approach when assessing a person's qualifications" and avoid excluding testimony based on "the thinness and other vulnerabilities in an expert's background[,]" as those matters are more appropriately addressed in cross-examination. State v. Jenewicz, 193 N.J. 440, 454-55 (2008). A witness may qualify as an expert "on the basis of his experience, even when it is limited." State v. Torres, 183 N.J. 554, 572 (2005).

Thus, for example, in State v. Moore, 122 N.J. 420, 458-59 (1991), the Court held that a trooper with two years' experience as a crime scene investigator and only two days training in blood-spatter analysis, qualified as an expert in blood splatter analysis. And, in State v. Krivacska, 341 N.J. Super. 1, 32-33 (App. Div. 2001), the court affirmed a decision allowing a psychologist to offer expert opinion about a cognitively impaired person even though the psychologist did not have experience with the person's particular impairment and did not specialize in this field.

Here, O'Leary testified during an extensive voir dire that he had close to twenty years' experience in homicide investigative work, which included cell phone data analysis, and he had qualified as an expert in cell phone analysis in five other cases. He also had approximately eight years' experience in the private sector conducting cell phone investigative work. Thus, O'Leary had sufficient experience to qualify as an expert. Moreover, the jury was aware of the shortcomings in his training and experience because defense counsel extensively questioned him on that during voir dire and cross-examination. Therefore, we conclude that the judge did not err in qualifying O'Leary as an expert and in admitting his testimony.

We also disagree with defendant's argument that because O'Leary did not use the "drive test" in formulating his opinion on defendant's location when he used his cell phone, O'Leary's testimony should not have been admitted. The admissibility of evidence, including that of expert testimony, is a matter within the sound discretion of the trial court. State v. McGuire, 419 N.J. Super. 88, 123 (App. Div. 2011). "Under that standard, an appellate court should not substitute its own judgment for that of the trial court, unless 'the trial court's ruling was so wide of the mark that a manifest denial of justice resulted.'" State

v. Brown, 170 N.J. 138, 147 (2001) (quoting State v. Marrero, 148 N.J. 469, 484 (1997)).

With respect to the drive test, which defendant claims is the only reliable method to determine a cell phone tower's coverage and thus the location of a phone when a call is placed, the court in New York SMSA Ltd. v. Twp. of Mendham Zoning Bd. of Adjustment, 366 N.J. Super. 141, 150 (App. Div. 2004), described that test as follows: "In a drive test, a specially equipped vehicle travels throughout an area scanning and recording signal strengths over a given frequency range. The data obtained from the drive test is then processed by a computer and plotted in the form of a propagation map," which shows gaps in coverage and areas where coverage is weak. Ibid. Thus, a drive test does not provide the location of a cell phone when a call is made, but rather, provides data on a cell tower's frequency range, which a computer then uses to create a map of the tower's frequency range.

While the drive test is an accepted method of determining the reach of a tower's frequency, nothing suggests that it is the only acceptable method of estimating a cell phone's location during a call. The method that O'Leary used, which was based on the number and location of towers in Jersey City, is consistent with case law on this topic.

A-5869-17T3

During his testimony, O'Leary thoroughly explained the basis for his opinion concerning defendant's location when he used his cell phone around the time Revis was shot. According to O'Leary, when a cell phone sends a call, the tower with which the phone is connected establishes two channels, one for the sending phone and one for the receiving phone. Each tower has a limited number of channels, and the more channels that are being used, the weaker the frequency may become. While the tower with which the phone is connected is usually the tower closest to the phone, the phone may connect with a tower farther away if the initial tower's frequency is weak. This will allow the phone to maintain the best, or clearest, frequency throughout the call. The phone receiving the call will also connect to the tower with the clearest frequency, which will usually be the tower closest to it.

In densely populated urban areas like Jersey City, O'Leary said cell phone towers are clustered "fairly close together so that they create seamless coverage" to service the numerous phones in the area. "[O]ften times the coverage from one tower will intersect with the coverage from another tower." Where towers are located close to one another, the subscribers "keep the power [of their] frequencies] at a lower volume[,] for lack of a better term" to decrease "interfere[ence] with adjacent towers." "[B]ecause the cell phone companies

17

only have a certain number of frequencies allotted to them in a certain area, they reuse the frequencies in" nearby towers to lessen interference and increase coverage.

O'Leary opined that in an area such as Jersey City, the maximum distance at which a cell phone would connect with a tower was "[p]robably a mile and a half." He believed that was "the absolute maximum" distance because there are "many" towers in Jersey City and towers "reuse the frequencies" in nearby towers to promote the best frequency. Because Journal Square was at least two miles away from each of the towers to which defendant's phone connected when he made calls near the murder scene, O'Leary opined that defendant could not have been in Journal Square at the times the calls were made.

As the Court explained in State v. Earls, 214 N.J. 564, 576-79 (2013), a case that considered whether the use of cell phone tracking to locate a defendant violated the Fourth Amendment, cell phone call records can be used to identify the location of a phone when it made a call based on the tower that it connected to when the call was placed. In so explaining, the Court relied on federal and state case law, as well as Congressional testimony, on the manner in which cell phones transmit calls and how that information can be used to locate a particular phone. Id. at 576-79.

Similar to O'Leary's testimony, the Earls Court explained that cell phones connect to a network of towers to transmit calls through frequencies provided by the towers. Id. at 576-77. A phone will connect to the nearest tower with the clearest frequency and will transfer to a tower with a stronger frequency if the initial tower's frequency decreases. Ibid. In areas with numerous towers, the range of frequency for each tower will be smaller, so as to decrease interference with other towers' frequency. Id. at 578. This, in turn, makes locating a specific phone in an urban area with many towers easier and more precise. Ibid. "As the number of cell towers or base stations increases, the size of the sector shrinks and tracking becomes more precise." Ibid. Thus, O'Leary's manner of determining the location of a call by using the towers the calls connected to is supported by our case law.

Additionally, O'Leary's testimony was consistent with the testimony of Sierra, the custodian of records for T-Mobile. As noted above, Sierra confirmed that the range of coverage of each tower varies by geographic area and that in urban areas where towers are located "about every two blocks," the range of coverage is also about two blocks. Under these circumstances, the judge did not abuse her discretion by admitting O'Leary's testimony about the cell towers and defendant's location when his phone connected to them.

A-5869-17T3

Finally on this point, a N.J.R.E. 104 hearing was not needed under the circumstances of this case. O'Leary clearly qualified as an expert and defendant was able to cross-examine him in detail concerning his qualifications and the methodology he used to arrive at his opinions. Therefore, we also reject defendant's contention on this point.

IV.

In Point III, defendant argues that the trial judge erred by denying his motion for a mistrial based upon a remark Caicedo made during his testimony. This argument lacks merit.

At the conclusion of Caicedo's testimony on direct examination, the prosecutor asked if he was aware of whether defendant had a permit to possess a handgun. Caicedo answered: "To my knowledge [defendant] was a . . . considered a certain person not to . . . ." Before Caicedo completed his response, defense counsel objected. At the sidebar that followed, which was not fully transcribed, the judge sustained the objection. Defendant's attorney did not request a curative instruction and, when Caicedo resumed his direct testimony, the prosecutor asked him to respond yes or no, and Caicedo said "no." Defense counsel then began her cross-examination.

The following day, defense counsel said she was "renew[ing]" her application for a mistrial based on Caicedo's testimony. Counsel argued that Caicedo's partial answer suggested that defendant was a certain person not to have a weapon based upon a prior felony conviction and, because the jury included "several people with law enforcement experience," they would understand Caicedo's response to mean that defendant had a criminal record. The judge denied the motion, finding that Caicedo's response was not so prejudicial that it infringed on defendant's right to a fair trial.

On appeal, defendant again contends that Caicedo's remark was prejudicial to him and warranted a mistrial. We disagree.

The decision whether to grant a mistrial is "peculiarly within the competence of the trial judge, who has the feel of the case and is best equipped to gauge the effect of a prejudicial comment on the jury in the overall setting." State v. Hogan, 297 N.J. Super. 7, 15 (App. Div. 1997) (quoting State v. Winter, 96 N.J. 640, 647 (1984)). Therefore, we will not disturb a trial court's ruling unless there is an abuse of discretion. State v. Harvey, 151 N.J. 117, 205 (1997).

We detect no abuse of discretion here. Caicedo never completed his response to the question and, therefore, he never identified defendant as a person who was not permitted to possess a weapon because of a disqualifying criminal

record.  Defendant's claim that members of the jury would have inferred that information is based upon pure speculation.

We also reject defendant's argument that the judge should have given the jury a sua sponte curative instruction.  Where a defendant fails to request a curative instruction, he or she "must show that the failure to give such an instruction sua sponte constitutes an error 'clearly capable of producing an unjust result.'"  State v. Mays, 321 N.J. Super. 619, 633 (App. Div. 1999) (quoting State v. Loftin, 287 N.J. Super. 76, 97 (App. Div. 1996)).

Applying this standard, we are satisfied that Caicedo's fleeting and incomplete response was unlikely to result in a verdict the jury may not have otherwise reached.  Indeed, had the judge given a curative instruction after Caicedo's abbreviated answer, it may have drawn unnecessary attention to the response and suggested the very information that defendant wanted to avoid being presented to the jury.

V.

Defendant argues in Point IV that the trial judge incorrectly granted the State's motion to bar him from presenting evidence that Revis was a drug dealer, which defendant claimed exposed the victim to danger and may have established third-party guilt.  Again, we disagree.

22

The Sixth and Fourteenth Amendments grant a criminal defendant the right "to a meaningful opportunity to present a complete defense." Crane v. Kentucky, 476 U.S. 683, 690 (1986) (quoting California v. Trombetta, 467 U.S. 479, 485 (1984)). That right includes "the right to argue that someone else committed the crime." State v. Fortin, 178 N.J. 540, 590 (2004).

However, to be admissible, evidence supporting third-party guilt "must satisfy the standards of the New Jersey Rules of Evidence." Id. at 591. Among those standards is that the evidence be relevant to the issues the jury must resolve. N.J.R.E. 401. Relevant evidence is "evidence having a tendency in reason to prove or disprove any fact of consequence to the determination of the action." N.J.R.E. 401. See also Jenewicz, 193 N.J. at 457-58 ("Analyzing relevance requires examining the logical connection between the proffered evidence and a fact in issue.").

Because the defendant in a criminal case bears no burden of proving innocence, a defendant does not have to show that evidence of third-party guilt "supports a probability that another person committed the crime." Fortin, 178 N.J. at 591. Rather, the defendant must only show that the evidence is "'capable of raising a reasonable doubt of defendant's guilt' to warrant its admissibility."

Ibid. (quoting State v. Koedatich, 112 N.J. 225, 299 (1988) (Koedatich II)).

Thus,

> [s]uch evidence cannot be withheld from the jury "if the proof offered has a rational tendency to engender a reasonable doubt with respect to an essential feature of the State's case." State v. Sturdivant, 31 N.J. 165, 179 (1959). Stated more concretely, there must be "some link . . . between the third party and the victim or crime," Koedatich II, 112 N.J. at 300, "capable of inducing reasonable" people to regard the evidence "as bearing upon the State's case," Sturdivant, 31 N.J. at 179. The connection between the third party and the crime cannot be left to conjecture. Ibid.
>
> [Fortin, 178 N.J. at 591.]

The trial court's decision regarding the admissibility of third-party guilt evidence "is fact sensitive" and thus entitled to deference. Ibid. We review a judge's ruling on admission of evidence of third-party guilt for abuse of discretion. State v. Cotto, 182 N.J. 316, 333 (2005).

In this case, defendant sought to introduce testimony from Revis's friends that Revis sold prescription drugs, that he was selling those drugs in Jersey City on the day of his murder, and that he had been robbed in the past while selling drugs. The trial judge held that the statements were not admissible because they did not "tend to prove or disprove any fact of consequence regarding [d]efendant's role in the death of . . . Revis." Moreover, the judge found that

24

evidence of Revis's alleged drug dealing "would have the effect of putting [the] victim on trial and distracting the jury from the issue of Defendant's involvement on the homicide."

In so ruling, the court drew support from Fortin, 178 N.J. at 590-92, where the Supreme Court affirmed the exclusion of a rape and murder victim's alleged drug dealing to establish third-party guilt. There, the defendant sought to introduce evidence of the victim's drug dealing to suggest that she may have been murdered during a drug deal gone wrong. Fortin, 178 N.J. at 592. However, no evidence suggested that she was selling drugs near or at the time of her murder. Ibid. Thus, the trial court found, and the Supreme Court agreed, that "the evidence did not suggest, even inferentially, that [the victim's] drug dealing was connected in any way to her murder." Id. at 593. Even if it "had any probative value," that value "was substantially outweighed by the risk of undue prejudice and confusion of the issues." Ibid. (citing N.J.R.E. 403). Thus, the Court concluded that "the drug-dealing evidence bore no relevance to any material issue in the case and, accordingly, did not have the capacity to raise a reasonable doubt of defendant's guilt." Ibid.

Here, the facts were similar to those in Fortin. No evidence established that Revis was selling drugs at or near the time of his death, and defendant's

25

suggestion that the murder may have been related to a drug sale was based on pure conjecture.  Because defendant's proffered evidence was not relevant to the issue of guilt and had the tendency to confuse the jury, the judge properly excluded it.

## VI.

Defendant argues in Point V of his brief that the cumulative prejudice of the errors he raises deprived him of a fair trial.  Having rejected defendant's argument that any reversible error occurred during his trial, we also reject his cumulative error argument.

## VII.

Finally, defendant contends in Point VI that his sentence was excessive. We disagree.

Trial judges have broad sentencing discretion as long as the sentence is based on competent credible evidence and fits within the statutory framework. State v. Dalziel, 182 N.J. 494, 500 (2005).  Judges must identify and consider "any relevant aggravating and mitigating factors" that "are called to the court's attention" and "explain how they arrived at a particular sentence." State v. Case, 220 N.J. 49, 64-65 (2014) (quoting State v. Blackmon, 202 N.J. 283, 297

(2010)). "Appellate review of sentencing is deferential," and we therefore avoid substituting our judgment for the judgment of the trial court. Id. at 65.

We are satisfied the judge made findings of fact concerning aggravating and mitigating factors that were based on competent and reasonably credible evidence in the record, and applied the correct sentencing guidelines enunciated in the Code. Accordingly, we discern no basis to second-guess the sentence.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5869-17T3