# United States Court of Appeals
## For the First Circuit

No. 01-2737

ATC REALTY, LLC; SBA TOWERS, INC.,

Plaintiffs, Appellees,

v.

TOWN OF KINGSTON, NEW HAMPSHIRE,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. James R. Muirhead, U.S. Magistrate Judge]

Before

Torruella, Lynch and Lipez,

Circuit Judges.

Robert D. Ciandella, with whom Robert M. Derosier and Donahue, Tucker & Ciandella were on brief, for appellant.
Steven E. Grill, with whom Devine, Millimet & Branch, P.A. were on brief, for appellees.

September 5, 2002

**TORRUELLA**, **Circuit Judge**.   Plaintiffs-appellees ATC Realty, LLC and SBA Towers, Inc. filed suit in district court seeking an order directing the Town of Kingston, New Hampshire to grant them all the permits necessary to construct a wireless telecommunications tower in the town.  The district court granted summary judgment in plaintiffs' favor on the ground that there was insufficient evidence to support the Town of Kingston's decision to deny plaintiffs' application to construct a tower.  Defendant-appellant Town of Kingston ("Town" or "Kingston") appeals the district court's grant of summary judgment, arguing that the Town's rejection of the plaintiffs' application is supported by substantial evidence.  Because we conclude that there was substantial evidence to support the Town's decision in the record, we reverse entry of summary judgment for plaintiffs and direct that summary judgment be entered for the Town.

### FACTUAL BACKGROUND

Wireless service companies provide consumers with mobile telephone service.  To activate the technology upon which their service relies, these companies must construct a network of telecommunication towers that transmits low-power, high-frequency radio signals.  Incapable of building this network alone, they rely on plaintiffs SBA Towers and ATC Realty (collectively, "SBA/ATC") to develop such telecommunication towers for them.  Plaintiffs, in turn, lease antenna facilities on these towers to the wireless service companies.

-2-

In 1999, several wireless service providers noticed a significant coverage gap along Route 125 in the northern region of Kingston, New Hampshire. This gap left customers in the area without wireless telecommunications service and disconnected the telephone calls of mobile phone users passing through the gap. Seeking to rectify this problem, SBA/ATC applied to the Kingston Planning Board ("Planning Board" or "Board") for permission to construct "an unlighted 180 foot free standing multi-user telecommunication tower" on Marshall Road in Kingston.[1] Two months after the plaintiffs submitted their application, however, American Tower, a direct competitor, applied for a permit to construct a similar tower on Depot Road in Kingston.

After holding several public hearings, conducting on-site inspections of the proposed tower locations, and consulting a telecommunications expert, the Planning Board voted on October 17, 2000, to approve the construction of only one of the two proposed towers. In the same meeting, the Board voted to deny the plaintiffs' application for a construction permit and, in a subsequent vote, to grant American Tower's application. Finally, the Board voted again to deny plaintiffs' application.

Shortly thereafter, the Planning Board issued a written decision formally adopting the results of the votes taken at the

---

[1] Like many municipalities, Kingston has enacted an ordinance that regulates the siting of wireless telecommunication towers. See Kingston, N.H., Zoning & Building Codes art. VII, § 7.80 (1997) ("Telecommunications Facility Ordinance"). Under the ordinance, an applicant seeking to build such a facility must obtain a conditional use permit from the Kingston Planning Board. See id.

October 17 meeting.  Using the Town's Telecommunications Facility Ordinance to define its criteria, the Board rejected the plaintiffs' application on four grounds:

> 1)    Based upon the purposes section of the Kingston zoning ordinance letters C and E it is the responsibility of the Kingston Planning board to provide for minimal impact siting and to require cooperation and coordination between telecommunications service providers in order to reduce cumulative negative impacts upon Kingston.
>
> 2)    The location of [SBA/ATC's] proposed location is in close proximity to residential abutters.  While there are commercial users backing into the property, the majority of the abutting and nearby properties are residential and of a rural nature.  The siting of this tower does not meet the intent of the ordinance to reduce adverse impacts on neighborhood aesthetics.
>
> 3)  The design of the [SBA/ATC] tower does not prevent nor reduce the visual intrusive\ness [sic] along the NH Route 125 corridor. Minimizing the adverse visual impact is required by the Town's ordinances.
>
> 4)    The Planning Board hired a telecommunication consultant to assist in determining the technical viability of the SBA/ATC site.  This consultant provided evidence that two proposed sites offered the same ability to cover existing service gaps. As a result, the SBA/ATC site failed to meet the standard of section D) of the Town's ordinance which indicates that all other reasonable opportunities have been exhausted. In addition Section VII,. 3., paragraph h and j require the Planning Board to consider other factors in making decisions that include availability of existing towers and other structures and the availability of alternative siting locations. The Planning board has done this with respect to this denial.

After their application was rejected in writing, SBA/ATC filed this suit in the United States District Court for the

District of New Hampshire, claiming that the Board's decision was not supported by substantial evidence as required by statute. See 47 U.S.C. § 332(c)(7)(B)(iii). The district court granted summary judgment in plaintiffs' favor, and the Town filed this timely appeal.

## STANDARD OF REVIEW

We review de novo the district court's grant of summary judgment. See Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 33 (1st Cir. 2001).

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "[T]o defeat a properly supported motion for summary judgment, the nonmoving party must establish a trial-worthy issue by presenting enough competent evidence to enable a finding favorable to the nonmoving party." LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 842 (1st Cir. 1993) (internal quotation marks omitted). In exercising our review, we construe the record evidence "in the light most favorable to, and drawing all reasonable inferences in favor of, the nonmoving party." Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 5 (1st Cir. 2000).

**DISCUSSION**

**I.**

The Telecommunications Act ("TCA") works like a scale that, inter alia, attempts to balance two objects of competing weight: on one arm sits the need to accelerate the deployment of telecommunications technology, while on the other arm rests the desire to preserve state and local control over zoning matters. 47 U.S.C. § 332(c)(7)(A)-(B) (1994 & Supp. II 1996); see generally Southwestern Bell Mobile Sys. v. Todd, 244 F.3d 51, 61 (1st Cir. 2001). Accordingly, though state and local governments have the power "to deny . . . request[s] to place, construct, or modify personal wireless service facilities," their decisions must be "in writing and supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii). This balance strengthens the decision making authority of local zoning boards, while protecting wireless service providers from unsupported decisions that stymie the expansion of telecommunication technology. See generally Brehmer v. Planning Bd. of Wellfleet, 238 F.3d 117, 122 (1st Cir. 2001).

Plaintiffs SBA/ATC argue that they are entitled to summary judgment because the Town's rejection of their application is not supported by substantial evidence. "The TCA's substantial evidence test is a procedural safeguard which is centrally directed at whether the local zoning authority's decision is consistent with the applicable zoning requirements." Omnipoint Communications MB Operations v. Lincoln, 107 F. Supp. 2d 108, 115 (D. Mass. 2000)

(citing <u>Amherst</u> v. <u>Omnipoint Communications Enters., Inc.</u>, 173 F.3d 9, 16 (1st Cir. 1999)). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Cellular Tel. Co.</u> v. <u>Zoning Bd. of Adjustment of Ho-Ho-Kus</u>, 197 F.3d 64, 71 (3d Cir. 1999) (internal citations omitted). The Board's decision will thus withstand our scrutiny if it is "supported by . . . more than a scintilla of evidence." <u>Cellular Tel. Co.</u> v. <u>Oyster Bay</u>, 166 F.3d 490, 494 (2d Cir. 1999); <u>accord</u> <u>NLRB</u> v. <u>Grand Canyon Mining Co.</u>, 116 F.3d 1039, 1044 (4th Cir. 1997) ("[Substantial evidence] requires more than a scintilla but less than a preponderance." (internal citations omitted)).

## II.

This case does not involve a claim that the Board has effectively prohibited the provision of telecommunication services needed to close a service gap. <u>See</u> 47 U.S.C. § 332(c)(7)(B)(i)(II). Rather, the Board has granted permission to plaintiffs' competitors to build a tower which will close the service gap along Route 125.

The only question before us is whether the Board's decision to deny the plaintiff's application is supported by substantial evidence. In determining that question, in the absence of any claim of procedural irregularity by the Board, we restrict our review to the record before the Board. <u>See</u> <u>Nat'l Tower, LLC</u> v. <u>Plainville Zoning Bd. of Appeals</u>, No. 01-2472, 2002 U.S. App. LEXIS 14465 at *17-*18 (1st Cir. July 18, 2002); <u>Todd</u>, 244 F.3d at 58

-7-

(quoting Penobscot Air Servs., Ltd. v. Fed. Aviation Admin., 164 F.3d 713, 718 (1st Cir. 1999)). We do not review the question de novo; we must uphold the Board's decision unless it is not supported by substantial evidence.

Before scrutinizing the factors cited by the Board in defense of its decision to reject plaintiffs' application, we pause to consider what mode of analysis to apply. The Town argues that, in determining whether the Board's decision is supported by substantial evidence, we should not compare the relative merits of the two applications. Instead, we should simply focus on whether there is sufficient evidence in the record to reject the plaintiffs' application. Conversely, the plaintiffs claim that the Board's votes to deny their application and to grant American Tower's application should essentially be treated as one decision. This approach, then, would require the Board to provide substantial evidence for its decision to choose American Tower's application over the plaintiffs'.

For the purposes of this appeal, we assume, without deciding, that the comparative model proposed by plaintiffs is the proper analytical framework. Even after employing this more exacting model, however, we find that the plaintiffs have failed to demonstrate that the Board's selection of American Tower's bid instead of the plaintiffs' is not supported by substantial evidence.

In its written decision, the Board offered four reasons for rejecting the plaintiffs' application to construct a telecommunication tower. We address each justification in turn.

## A. Cooperation Among Service Providers

The first reason set forth in the Board's written decision for denying plaintiffs' application concerns the Town's responsibility to provide for minimal impact siting and to promote cooperation between competitors. Under the Telecommunications Facility Ordinance, the Town is required to limit the construction of telecommunication towers by encouraging cooperation between competitors and having as many wireless service providers on a single tower as possible. Art. VII, § 7.80(II)(C). The Board felt that the plaintiffs' application did not adequately meet these objectives.

In defense of the Board's reliance on this factor, the Town cites persuasive evidence in the record to support the conclusion that only one tower was necessary to rectify the coverage gap. For instance, Tony Wells, a radio frequency engineer for American Tower, stated that "the coverage for either [tower] proposal would be equivalent." In addition, Ivan Pagacik, an independent telecommunications consultant, informed the Board that "[t]he proposed American Tower site at 140 feet does fill in th[e] [coverage] gap."[2]

---

[2] Pagacik noted, however, that American Tower's proposal to construct a 140-foot tower would provide minimal overlap with the

Though this evidence may justify the Board's decision to construct only one tower, however, it provides no basis for choosing American Tower's application over the plaintiffs'. The crucial question, then, is whether the plaintiffs have shown that the Board's reliance on this factor to select American Tower's proposal over the plaintiffs' is not supported by substantial evidence.[3] Both SBA/ATC and American Tower assured the Planning Board that they would allow competing wireless service providers to use the antenna facilities on their towers. The only difference between the proposals is that whereas the plaintiffs' proposed tower could accommodate six wireless service providers, American Tower could only hold five providers on its tower. Thus, in terms of willingness to cooperate and ability to serve wireless

coverage provided by nearby towers. This decreased overlap would likely affect the ability of mobile telephone users to make a successful transition from coverage provided by an antenna on one tower to coverage provided by an antenna on another tower.

This conclusion, however, is largely irrelevant because the Planning Board granted American Tower permission to construct a tower 40 feet higher than the height at which Pagacik conducted his tests. As plaintiffs' counsel conceded at oral argument, the higher a tower is, the stronger coverage it provides. Thus, it is reasonable to infer, especially at the summary judgment level, that the 40-foot increase in the tower's height went a long way in fixing any overlap deficiency. General support for drawing this inference can be found in SBA/ATC's own experimental tests, which show that the "coverage gap could not be filled at 140 [feet]," but it could be filled at 180 feet.

Moreover, Pagacik allegedly told several Board members, without ambiguity, that only one tower was necessary since either of the proposed towers would suffice to cover the service gap.

[3] Because the Board specifically dealt with minimal impact siting in its other reasons for rejecting plaintiffs' application, we reserve our discussion on that issue until it is more pertinent.

companies, the proposals are virtually identical, with the plaintiffs' application being marginally better.[4]

B.  **Impact on Residential Properties and Neighborhood Aesthetics**

The Board's second reason for denying plaintiffs' application for a conditional use permit was that their proposed tower was too close to residential abutters and had an adverse impact on neighborhood aesthetics.  Under the Telecommunications Facility Ordinance, the Town is authorized to consider the proximity of proposed towers to residential development and their impact on the surrounding aesthetics.  Art. VII, § 7.80(II)(B).

The two proposed sites are largely indistinguishable with respect to their proximity to residential areas.  Both sites have residential abutters and commercial businesses within close proximity.  They are also essentially equidistant from the areas zoned for commercial use.  Thus, the proposals are quite similar, if not identical, with respect to this factor.

In regard to the aesthetic impact of the towers, the Board considered comments from residential abutters to the proposed

_____

[4]  Plaintiffs also argue that the inferiority of the American Tower proposal is evidenced by the fact that American Tower still has not been able to lease the antenna facilities on its tower to any wireless service provider, despite the fact that its application was approved by the Board.

However, it is too speculative to attribute American Tower's inability to contract with any wireless service providers to its tower's inferiority.  The dearth of clientele may be a product of the fact that wireless service companies are waiting to see the outcome of this litigation before committing to one tower or waiting to see if two towers are constructed in the Town, thereby maximizing competition and reducing lease rates.  We thus give no weight to plaintiffs' speculative argument.

-11-

sites. See, e.g., Todd, 244 F.3d at 61 (finding substantial evidence of adverse visual impact where residents specifically complained that the proposed tower was of a different magnitude than anything else in the vicinity and was inconsistent with the residential uses around it). Several residential neighbors to the plaintiffs' site criticized SBA/ATC's tower for its adverse aesthetic impact. Resident abutters Elisha and Steven Blaisdell objected to the proposed tower, arguing that it would destroy the "picturesque" quality of the surrounding area. Mariah Champagne submitted a letter characterizing plaintiffs' tower as an "eyesore" that should be situated in a more rural location. She also took issue with the fact that the tower would be located on property that was once listed by the state as being historically significant. Tina Staublin echoed concerns over the adverse aesthetic impact the tower would have on the neighborhood. Finally, Andrea and Almus Kenter expressed their displeasure over having a "clear view" of the proposed tower from their home. They also emphasized the fact that the tower's construction would be inconsistent with the surrounding bucolic area.

Thus, nearly forty percent of the residential abutters to the plaintiffs' proposed site opposed the application on aesthetic grounds. Conversely, the Board did not receive a single aesthetic objection to the American Tower proposal. Moreover, at least one Board member attended a crane test on American Tower's proposed site, which involved elevating a crane to 180 feet to determine the visibility of the proposed tower from the surrounding neighborhood.

-12-

The results of the test demonstrated that "the crane was very difficult to see," which may explain why no aesthetic objections were made to the American Tower proposal.

Plaintiffs largely ignore the results of this empirical test and concentrate their attack on what they perceive to be the easier target: the residential abutters' comments. SBA/ATC argue that local residents cannot defeat a tower proposal merely by trumpeting "negative comments that are applicable to any tower, regardless of location." Todd, 244 F.3d at 61. Because they characterize the residential abutters' comments as generalized aesthetic objections, plaintiffs conclude that the Board incorrectly relied upon this evidence to distinguish between the two proposals.

Though several of the abutters' objections to the visual impact of the plaintiffs' tower specifically addressed why the proposed facility was inappropriate for the chosen site, we will assume, for the sake of argument, that the abutters' comments were so general that they could apply to any tower. Even assuming as much, however, the Board correctly relied on this evidence in light of the facts of this unusual case. As noted, courts have consistently held that a "few generalized expressions of concern with 'aesthetics' cannot serve as substantial evidence on which [a town] could base [a] denial." Oyster Bay, 166 F.3d at 496. However, these rulings have not been made in the context of a town deciding between two proposed towers. Rather, they have been made in cases in which towns have rejected the only proposed tower

application before them. See, e.g., Todd, 244 F.3d at 52; Preferred Sites v. Troup County, No. 01-14182, 2002 WL 1473139, at *2 (11th Cir. July 10, 2002); Telespectrum, Inc. v. Pub. Serv. Comm'n of Ky., 227 F.3d 414, 418 (6th Cir. 2000); Omnipoint Corp. v. Zoning Hearing Bd. of Pine Grove, 181 F.3d 403, 407 (3d Cir. 1999). In the latter context, courts fear that local governments may be relying on abutters' general aesthetic objections to mask a de facto prohibition of wireless service. See generally Todd, 244 F.3d at 61.

In contrast, the instant case, given the mode of analysis we have employed, involves the Board's comparison between two competing proposals and its selection of American Tower's application over the plaintiffs'. The fact that the Board ultimately granted a permit to the plaintiffs' competitor demonstrates that the Board is not generally hostile to the construction of telecommunication towers. In this context, when a planning board has decided to construct a tower and must decide which of several proposed towers to construct, it is perfectly reasonable for the Board to consider, and be swayed by, the general aesthetic concerns of residential abutters, especially where, as here, the proposed towers are otherwise virtually identical.

In sum, whereas both applications are identical with respect to proximity to residential abutters, there is undisputed evidence that the plaintiffs' application would have a stronger adverse aesthetic impact on the surrounding neighborhood.

-14-

## C. **Visual Intrusiveness Along Route 125**

The Board based its third reason for rejecting plaintiffs' application on the fact that "the design of the [SBA/ATC] tower does not reduce visual intrusiveness along the Route 125 corridor." Though the record supports the Board's conclusion, it also indicates that both proposed towers would be visible from Route 125. However, the best evidence of minimal visual intrusiveness came after a Board member conducted a visual inspection of the American Tower site from Route 125. She concluded that she "could hardly see [the tower] with the exception of one small spot . . . . She thought that if she were not looking for [the tower], it would not be seen."[5] Plaintiffs have presented no evidence to challenge this observation.[6]

---

[5] Presumably, this visual test was conducted when the crane, substituting for the tower, was in place.

[6] Plaintiffs also fault the Board for failing to consider the visual impact that the American Tower proposal would have on property with historical significance. See Telecommunications Facility Ordinance art. VII, § 7.80(B) (stating that the Board may consider the impact that a proposed tower may have on "historically significant locations"). In this regard, several Board members observed that the plaintiffs' proposal would have no visual impact on the historic district; however, no such finding was made with respect to the American Tower proposal.

Though no specific finding was made regarding the visual impact that the American Tower proposal would have on the historic district of Kingston, the Board conducted several photographic simulations illustrating the view of the proposed tower from several locations. The Board also conducted an on-site inspection and took several aerial photos of the proposed tower. Neither the simulations nor the photographs indicates any visual intrusion on the historic district of Kingston.

**D.  <u>Failure to Exhaust Alternative Opportunities</u>**

The final reason for denying SBA/ATC's application for a conditional use permit was that plaintiffs had failed to exhaust all other reasonable opportunities.  Pursuant to the Telecommunications Facility Ordinance, the Board is directed to "[p]ermit the construction of new towers only where all other reasonable opportunities have been exhausted."  Art. VII, § 7.80 (II)(D).

The only other reasonable opportunity available here was the competing proposal.  However, the plaintiffs submitted their application to the Planning Board two months prior to American Tower's application.  Thus, at the time SBA/ATC applied, American Tower's non-existent application could not have provided a reasonable opportunity that the plaintiffs were required to exhaust.

The Board also rejected the plaintiffs' application because it found that plaintiffs had failed to consider the availability of existing sites.  More specifically, because the Board granted American Tower's application before its final vote to reject the plaintiffs' application, the Board decided not to approve the plaintiffs' application because a reasonable alternative opportunity existed -- that is, American Tower's recently approved site.

However, given the comparative framework we have employed, this factor does not provide a basis for choosing American Tower's proposal over the plaintiffs'.  It assumes that

-16-

American Tower has been selected and faults the plaintiffs for not exploring that existing option. Thus, this justification assumes precisely what we are trying to determine: whether there is substantial evidence in the record to support the Board's selection of American Tower's proposal over the plaintiffs'.

## E.  The Results

After reviewing the record, we find that the plaintiffs have failed to demonstrate that the Board's selection was not supported by substantial evidence. The Planning Board was presented with two proposed towers that were virtually identical: the towers were of the same height; covered the same area; accommodated almost the same number of wireless providers; could be seen, in comparable fashion, from Route 125; had residential abutters; and were roughly equidistant from commercial zones. There is only one substantive difference between the proposed towers: unlike American Tower's application, plaintiffs' proposal engendered much opposition due to its adverse impact on the surrounding neighborhood aesthetic.

We must reiterate that our review is not focused on whether the Planning Board made the best or the correct decision. See AT&T Wireless PCS, Inc. v. Winston-Salem Zoning Bd. of Adjustment, 172 F.3d 307, 314 (4th Cir. 1999) ("The reviewing court cannot replace the agency's judgment, even if the court could have reached a justifiably different conclusion between two conflicting views had it reviewed the matter de novo."). Rather, we must simply determine whether the plaintiffs have demonstrated that the

Board's decision to choose American Tower's application over their application is supported by substantial evidence. Given the extreme similarity between the two proposals, and the Board's justifiable reliance on abutter comments to distinguish between them, we find that more than a scintilla of evidence exists to support the Board's decision and direct the district court to enter summary judgment in favor of the Town.

**IV.**

This case comes to us after a decision based on cross motions for summary judgment. Cross motions do not necessarily indicate agreement by the parties as to the material facts in the record. See Boston Five Cents Sav. Bank v. Sec'y of the Dep't of Hous. and Urban Dev., 768 F.2d 5, 11-12 (1st Cir. 1985); Wiley v. Am. Greetings Corp., 762 F.2d 139, 140-41 (1st Cir. 1985). But here, as we have stressed, the basis for decision is limited to the factual record that was before the Board. In this situation, it is appropriate for an appellate court to not only reverse a grant of summary judgment for one party, but direct its entry to the other party. See Wightman v. Springfield Terminal Ry. Co., 100 F.3d 228 (1st Cir. 1996) ("Cross motions simply require us to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." (emphasis added)). Because there is substantial evidence in the undisputed facts before the Board to support its decision, we direct entry of summary judgment for the Board and dismissal of this case. Our decision is further supported by the clear aim of the TCA, echoed in our precedents, of

-18-

expediting resolution of litigation over placement of wireless telecommunication facilities.  <u>See</u> 47 U.S.C. § 332(c)(7)(B)(v) (establishing expedited process for such challenges); <u>Nat'l Tower</u>, 2002 U.S. App. LEXIS 14465 at *24-*25.

## **CONCLUSION**

For the foregoing reasons, we **<u>reverse</u>** the district court's grant of summary judgment and **<u>enter</u>** summary judgment in favor of the Town.