**VOICE STREAM PCS I, LLC, d/b/a T–Mobile, Plaintiff,**

**Golden Road Baptist Church, Involuntary Plaintiff,**

v.

**CITY OF HILLSBORO, Defendant.**

**Civil No. 03–365–MO.**

United States District Court, D. Oregon.

Feb. 2, 2004.

---

Christopher P. Koback, Davis Wright Tremaine, LLP, Portland, OR, for Plaintiff.

Pamela J. Beery, Paul C. Elsner, Beery & Elsner, LLP, Portland, OR, for Defendant.

## OPINION AND ORDER

MOSMAN, District Judge.

Plaintiff Voice Stream PCS I, LLC ("plaintiff") brings this lawsuit under the Telecommunications Act of 1996 ("TCA"), seeking to overturn the City of Hillsboro's decision to deny plaintiff's conditional-use application to erect a wireless-telecommunications (or, as commonly called, a "cell-phone") tower in a residentially zoned area. The issues in this case pit the TCA's intention to deregulate the wireless telephone industry against the traditional control over local land use maintained by municipalities. For the reasons discussed below, municipal control prevails in this case.

## I. Background

Personal wireless services are dependent upon low power, high frequency radio signals that are transmitted from antennae placed on preexisting structures, such as water towers, or on newly constructed towers. See generally *Southwestern Bell Mobile Sys. v. Todd*, 244 F.3d 51, 56–57 (1st Cir.2001); *Sprint Spectrum, L.P. v. Willoth*, 176 F.3d 630, 634–35 (2d Cir. 1999). As a subscriber travels within a cellular provider's service area, the cellular call in progress is transferred from one cell site to another without noticeable interruption. To increase quality of service and therefore attract subscribers, providers usually have an incentive to increase the number of cells and correspondingly decrease the geographic coverage of each cell. In furtherance of this plan to improve service, coverage within an area is maintained by arranging antennae in a honeycomb-shaped grid. When the grid is placed over a city map, desired tower locations of course often fall in residential areas. And because wireless technology is relatively low-powered and requires line-of-sight to a tower, the necessary antennae generally must be placed on towers which loom over the landscape, commonly giving rise to opposition especially in residential areas.

Plaintiff submitted an application for a conditional-use permit to construct and maintain a 120–foot tower on residentially zoned property owned by the Golden Road Baptist Church in the City of Hillsboro. The church site is surrounded on all sides by residentially zoned property. Many of the surrounding homes are between 100 and 200 feet from the proposed site. As revealed by the record, the proposed site is in an area commonly described as scenic, as it is surrounded by fir trees and is near wetlands and a greenway. Neighbors, therefore, banded together to oppose plaintiff's permit application.

The City's Zoning Hearings Board held public hearings and accepted neighbors' opposition letters. The board also accepted a petition of over 50 residents expressing opposition. In addition, the board had before it maps, simulated photographs, and a chart depicting the location of the city's wireless-telecommunications facilities. The board applied Hillsboro Zoning Ordinance ("HZO") No.1945, Section 83(9). This ordinance provides as follows:

> The Commission or Hearings Board shall grant approval only if the proposal,

as conditioned, is determined to conform to the following criteria:

> (a) The granting of the application would meet some public need or convenience.
>
> (b) The granting of the application is in the public interest.
>
> (c) The property in question is reasonably suited for the use required.
>
> (d) The use requested would not have a substantial adverse effect on the rights of the owners of surrounding properties.
>
> (e) The use requested would conform to the maps and the goals and policies of the Hillsboro Comprehensive Plan.

The board ultimately issued a written decision denying plaintiff's application. Plaintiff appealed the board's denial to the city council. The city council issued a written decision, adopting in part the board's written decision and affirming the board's denial. The council found granting the application would meet a public need or convenience, because the tower would improve indoor cellular telephone coverage (although the council found the plaintiff did not prove its assertion the tower would improve communications for public-safety personnel). The council further found the property was suited for the proposed use, since the church's lot is large enough to accommodate the tower and no other infrastructure would be necessary to service the site. As for requirement (e) the council found this was met.

The council denied the permit because it determined the proposal would not be in the public interest and would have a substantial adverse effect on surrounding property owners' rights. Both of these findings were based on generally the same evidence: There was no showing denying the application would harm the public interest since the tower would only improve what plaintiff calls "urban" coverage, meaning coverage indoors. In addition,

both plaintiff and opponents testified plaintiff alternatively could have erected two towers at other sites, although plaintiff suggested this alternative would not have served its needs. The council further found the proposed tower would negatively affect the aesthetic character of the neighborhood, relying primarily on residents' concerns about the tower's effect on the neighborhood's natural surroundings, which include an undeveloped greenway. The council further relied on simulated pictures showing what the tower would look like. In addition, the council adopted the board's findings distinguishing two prior permits that had been granted to wireless providers for residential-area facilities: One of the facilities, the board found, was placed on an existing light pole at an athletic field. The board also observed that the other facility is located near a busy street and across from a commercial district.

While the council found there would be a negative aesthetic impact, it found the evidence inconclusive as to whether the tower would cause property values to decline. Plaintiff had submitted an expert report which studied the effects of towers in other neighborhoods and which concluded there would be no adverse effect. In response, residents submitted three letters from local realtors who concluded the tower would negatively affect property values. Based on this conflicting evidence, the council did not base its decision on property devaluation and determined property devaluation was not necessary for it to deny the application.

## II. Discussion

The TCA permits parties to bring cases like this in federal court:

> Any person adversely affected by any final action or failure to act [regarding siting a cell-phone tower] by a State or

local government or any instrumentality thereof ... may, within 30 days after such action or failure to act, commence an action in any court of competent jurisdiction.

47 U.S.C. § 332(c)(7)(B)(v). Congress therefore expressly intended for local zoning decisions which affect cell-phone towers to be reviewed by federal courts. A driving force behind this decision was Congress's conclusion that " 'siting and zoning decisions by non-federal units of government[ ] have created an inconsistent and, at times, conflicting patchwork of requirements which will inhibit' " the development and growth of wireless services. *Omnipoint Corp. v. Zoning Hearing Bd. of Pine Grove Township*, 181 F.3d 403, 407 (3d Cir.1999) (quoting H.R. Rep. 104–204, at 94 (1995), *reprinted in* 1996 U.S.C.C.A.N. 10, 61). Thus, generally speaking, the TCA reflects Congress's intent to expand wireless services and increase competition among providers. *Todd*, 244 F.3d at 57; see also H.R.Rep. No. 104–458, at 113 (1996), *reprinted in* 1996 U.S.C.C.A.N. 124, 124 (stating TCA intended "to provide for a pro-competitive, deregulatory national policy framework designed to accelerate rapidly private sector deployment of advanced telecommunications ... and services to all Americans by opening all telecommunications markets to competition").

But despite Congress's intention to advance competition among wireless providers, Congress also acknowledged "there are legitimate state and local concerns involved in regulating the siting of such facilities ... such as aesthetic values and the costs associated with the use and mainte-

nance of public rights-of-way." H.R. Rep. 104–204, at 94–95 (1995), *reprinted in* 1996 U.S.C.C.A.N. 10, 61. Consequently, the TCA expressly preserves local zoning authority regarding the placement of equipment such as cell-phone towers:

> Except as provided in this paragraph, nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities.

47 U.S.C. § 332(c)(7)(A).[1] However, the TCA restricts zoning boards' authority to base their denials on perceived adverse environmental effects, since that issue is heavily regulated by the federal government. *Id.* § 332(c)(7)(B)(iv). Congress also delineated three situations at issue in this case in which federal courts can reverse a local zoning board's denial of a permit for a cell-phone tower: (1) when the board's denial is not "supported by substantial evidence contained in a written record," (2) when the board's decision "prohibit[s] or ha[s] the effect of prohibiting the provision of personal wireless services," and (3) when the board's decision "unreasonably discriminate[s] among providers of functionally equivalent services." *Id.* § 332(c)(7)(B). Plaintiff contends that the city's denial violates each of these three provisions.[2]

## A. Substantial Evidence

Plaintiff argues that the city's denial of plaintiff's conditional-use application was not supported by "substantial evidence."

---

1. Notably, the House version of the bill would have given the FCC (rather than local zoning entities) authority to regulate tower siting. See generally *Sprint Spectrum L.P. v. Parish of Plaquemines*, No. 01–0520, 2003 WL 193456, at *5 (E.D.La. Jan. 28, 2003) (discussing TCA's legislative history). But, as Section 332(c)(7)(A) shows, Congress made a con-

scious decision to reject any scheme revoking local control over zoning decisions, even at the cost of inhibiting the growth of wireless services.

2. Although no formal motions have been filed with the court, the parties agreed at oral argument the case is ready to be decided.

Plaintiff essentially argues that the city's decision was improperly based on nothing more than general, speculative aesthetics concerns.

■ While the Ninth Circuit has not yet decided a case under the TCA provisions at issue in this case, other federal courts agree "substantial evidence," as used in the TCA, was meant generally to track the standard of the same name set forth in the Administrative Procedures Act. See, e.g., *Preferred Sites, LLC v. Troup County*, 296 F.3d 1210, 1218 (11th Cir.2002); *Todd*, 244 F.3d at 58; *Omnipoint Corp.*, 181 F.3d at 407–08; *Cellular Tel. Co. v. Town of Oyster Bay*, 166 F.3d 490, 494 (2d Cir.1999); *MetroPCS, Inc. v. City & County of San Francisco*, 259 F.Supp.2d 1004, 1009 (N.D.Cal.2003). Although the TCA does not itself define "substantial evidence," legislative history supports the decision to follow the Administrative Procedures Act standard. See H.R. Conf. Rep. 104–458, at 208, *reprinted in* 1996 U.S.C.C.A.N. 124, at 223 (stating TCA standard is intended as "the traditional standard used for judicial review of agency actions"). Substantial evidence, therefore, means " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Pierce v. Underwood*, 487 U.S. 552, 565, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). Substantial evidence is not "a large or considerable amount of evidence," and the fact two different conclusions could have been reached does not mean there is not substantial evidence. *Id.;* see also *Todd*, 244 F.3d at 58–59. As measured by degree, substantial evidence is usually considered to be "more than a mere scintilla" and less than a preponderance. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951). In short, the governing standard is "highly deferential" to the local government's decision but does not amount to a mere rubber stamp. *Second Generation Props., L.P. v. Town of Pelham*, 313 F.3d 620, 627 (1st Cir.2002). The court must examine the entire record, including evidence contradictory to the local government's decision, in determining whether substantial evidence supports the decision. See *Todd*, 244 F.3d at 58; *MetroPCS*, 259 F.Supp.2d at 1010.

In searching for substantial evidence, the government's decision is analyzed under the applicable zoning ordinance; " '[t]he TCA's substantial evidence test is a procedural safeguard which is centrally directed at whether the local zoning authority's decision is consistent with the applicable zoning requirements.' " *VoiceStream Minneapolis, Inc. v. St. Croix County*, 342 F.3d 818, 830 (7th Cir.2003) (quoting *ATC Realty, LLC v. Town of Kingston*, 303 F.3d 91, 94 (1st Cir.2002)). The party seeking to overturn the local government's decision carries the burden of showing the decision was not supported by substantial evidence. See *id.* at 830.

At the outset, the terms of the applicable zoning ordinance must be evaluated. The ordinance at issue here directs the city to reject a proposed conditional use when it concludes permitting the use would not be in the "public interest" or would have "a substantial adverse effect on the rights of the owners of surrounding properties." HZO § 83(9). In this case, the city made both of these findings, which plaintiff challenges.

The city council interpreted "public interest," as used in the ordinance, to contemplate a consideration of the public health, safety, and welfare of the community. R.38. The council further concluded the ordinance's "substantial adverse effect" language does not require any property-value devaluation but instead contemplates a consideration of whether an

owner's property use and enjoyment will be affected by the proposed use. R.40.

■ As with most such zoning ordinances, the open-ended nature of the ordinance's conditional-use criteria evinces an intent to grant wide discretion to the zoning board when making conditional-use decisions. Cf. *Schad v. Borough of Mt. Ephraim*, 452 U.S. 61, 68, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981) ("The power of local governments to zone and control land use is undoubtedly broad and its proper exercise is an essential aspect of achieving a satisfactory quality of life...."); *Berman v. Parker*, 348 U.S. 26, 33, 75 S.Ct. 98, 99 L.Ed. 27 (1954) ("The concept of the public welfare is broad and inclusive. The values it represents are spiritual as well as physical, aesthetic as well as monetary. It is within the power of the legislature to determine that the community should be beautiful as well as healthy ...." (citation omitted)). And under well-established Oregon law, a city can prohibit a proposed use of property "on the sole ground that the use is offensive to aesthetic sensibilities." *Oregon City v. Hartke*, 240 Or. 35, 46, 49, 400 P.2d 255 (1965). Accordingly, in light of the applicable ordinance's broad language, the city had the power to deny plaintiff's permit on grounds of "aesthetic considerations." *Oregon City*, 240 Or. at 49, 400 P.2d 255. The TCA, however, requires this court to evaluate the evidence to ensure the city's decision was not "irrational or substanceless." See *Todd*, 244 F.3d at 57.

As plaintiff recognizes, even under a substantial evidence review, zoning decisions based on aesthetic concerns can be valid. See *St. Croix County*, 342 F.3d at 831; *Troup County*, 296 F.3d at 1219; *Todd*, 244 F.3d at 61; *Pine Grove Township*, 181 F.3d at 408; *AT & T Wireless PCS, Inc. v. City Council of the City of Virginia Beach*, 155 F.3d 423, 430–31 & n. 6 (4th Cir.1998); see also H.R. Conf. Rep.

104–458, at 208, *reprinted in* 1996 U.S.C.C.A.N. 124, at 222 (contemplating that localities properly can base decision on aesthetic impact). Plaintiff does not cite, and the court could not find, any authority holding that the TCA renders aesthetic concerns an invalid basis upon which to base a permit denial. As summarized by the Seventh Circuit, "[n]othing in the Telecommunications Act forbids local authorities from applying general and nondiscriminatory standards derived from their zoning codes, and ... aesthetic harmony is a prominent goal underlying almost every such code." *Aegerter v. City of Delafield*, 174 F.3d 886, 891 (7th Cir.1999). Moreover, consistent with traditional zoning standards, local government is "entitled to make an aesthetic judgment" about the proposal "without justifying that judgment by reference to an economic or other quantifiable impact" such as property value. *Todd*, 244 F.3d at 61.

Plaintiff, however, correctly observes that cases have found general, unsubstantiated aesthetics concerns to have marginal evidentiary value. See, e.g., *PrimeCo Personal Communications, LP v. City of Mequon*, 352 F.3d 1147, 1150–51 (7th Cir. 2003) ("The only 'evidence' bearing on aesthetic considerations was the testimony of three or four residents that they don't like poles in general; they didn't say they would object to a flagpole in the church's [the proposed site's] backyard.... [T]here is no evidence that Verizon's proposed flagpole would if erected in the churchyard be considered unsightly by the neighbors...."); *Troup County*, 296 F.3d at 1219 (finding insufficient petitions which gave "no articulated reasons for the opposition" and a single affidavit reciting "generalized concerns" about the tower's negative aesthetic impact when there was no other evidence in the record); *Oyster Bay*, 166 F.3d at 492, 495–96 (finding insufficient evidence of visual blight because

"[v]ery few residents expressed aesthetic concerns at the hearings," comments suggested that the "residents who expressed aesthetic concerns did not understand what the proposed cell sites would actually look like," and health concerns, a basis generally improper under the TCA, "dominated the speakers' statements").

■ But even under the TCA, the board is entitled to make an aesthetic judgment as long as the judgment is "grounded in the specifics of the case," and does not evince merely an aesthetic opposition to cell-phone towers in general. *Todd*, 244 F.3d at 61; see also *Petersburg Cellular P'ship v. Bd. of Supervisors of Nottoway County*, 205 F.3d 688, 695 (4th Cir.2000) ("[If a zoning board] denies a permit based on the *reasonably-founded* concerns of the community then undoubtedly there is 'substantial evidence'" (emphasis in original)). Accordingly, when the evidence specifically focuses on the adverse visual impact of the tower at the *particular location at issue* more than a mere scintilla of evidence generally will exist.

Plaintiff nevertheless insists the evidence before the city in this case amounted to no more than unsupported and vague objections. See Plaintiff's Pre–Hearing Memorandum at 9. But a proper review of the record shows there was more than a scintilla of evidence "grounded in the specifics of the case." *Todd*, 244 F.3d at 61.

For example, neighboring residents submitted letters objecting to the tower's proposed location because the tower would infringe upon the neighborhood's prized natural setting, comprised of fir and evergreen trees as well as a greenway. See, e.g., R. 191, R.195, R.197, R.205, R.207, R.220, R.222, R.407, R.420. At the site, there is no significant commercial development; nor are there existing commercial towers or above-ground power lines. R.26, R.205, R.407, R.420. In addition, on each side of the tower is a

single-family residential zone; the record shows the tower would be surrounded by existing residences. See, e.g., R.247–58, R.769, R.816. Residents stated they relied on the natural, residential character of the neighborhood in purchasing their homes, which they would not have purchased had plaintiff's proposed tower been standing. R.191, R.199, R.205. The city properly relied on the evidence showing the tower would be incompatible with the character of this particular neighborhood. See, e.g., *Todd*, 244 F.3d at 61 ("The five limitations upon local authority in the TCA do not state or imply that the TCA prevents municipalities from exercising their traditional prerogatives to restrict and control development based upon aesthetic considerations...."); *Aegerter*, 174 F.3d at 890–91 (upholding zoning board's denial of cell-phone tower because the tower would be "unsightly" and "inconsistent" with the neighborhood, in which residents bought their homes in reliance on the neighborhood's existing residential character). In sum, although opponents made general assertions about the nature of cell-phone towers, they also considered the specific scene in which the proposed tower would appear.

Moreover, the city also gave consideration to the proposed tower's distance from surrounding homes. The city council cited an appraiser's testimony that no other cell-phone facility in the city sits as close to residences as would plaintiff's proposed tower. R.39. In the board's words, "the cell tower in this case would be in the heart of an R–7 single family residential neighborhood and would be the functional equivalent of placing a cell tower in the center of a subdivision." R.27. In addition, the board specifically distinguished the two other previously approved cell-phone facilities which sit in single-family residential zones. R.27. The board observed that one of the existing facilities was placed on an existing light pole at an athletic field and

that the other sits in a busy section of the city across from a commercial district. R.27. At the proposed site, the record indicates that many of the neighboring houses are between 100 and 200 feet from the proposed tower. As one witness observed, "[t]he proposed cell tower site regardless of where placed on the property would be within 100 feet of a single-family site." R.769.

In fact, in an attempt to compare the proposed site to other sites where homes are near cell-phone facilities, plaintiff's own expert witness picked four "subject" homes which are no less than 350 feet from the nearest cell-phone facility. R.265, R.269–70, R.279, R.289. Each of the expert's four subject homes is in Washington County (which includes the City of Hillsboro) and one of the homes is in the city. Notably, Washington County records indicate three of the expert's chosen homes actually are over 450 feet from the nearest cell-phone facility, with one of these three homes being 900 feet away. R.138–39. Thus the city had before it plaintiff's own evidence indicating the proposed site is significantly different from the area's most comparable sites.[3]

Coupled with the city's aesthetic judgment is the fact the proposed tower would not fill a complete void in coverage but instead would only improve indoor or, in plaintiff's term, "urban" coverage. R.16; see Plaintiff's Reply Memorandum at 3. In determining whether the tower would be in the "public interest," the city was within its authority to weigh the benefit of merely improving the existing coverage against the negative aesthetic impact the tower would cause. See, e.g., *City of Mequon,*

352 F.3d at 1149 ("A reasonable decision whether to approve the construction of an antenna for cellphone communications requires balancing two considerations. The first is the contribution that the antenna will make to the availability of cellphone services. The second is the aesthetic or other harm that the antenna will cause."). Such a policy-based decision is precisely the type of decision Congress left to local zoning boards.

Keeping in mind the standard is merely "more than a scintilla," and less than a preponderance, the city based its denial on sufficient evidence. Certainly, as plaintiff contends, it is possible to conclude the proposed tower would not be a visual blight, judging by the simulated photographs in the record. This court's role, however, is not to interject its own judgment, but rather to apply the deferential standard of substantial evidence to the city's judgment. See *Todd,* 244 F.3d at 58 ("the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."); *Aegerter,* 174 F.3d at 888 ("While the conclusions the City reached may not be the only possible ones, they find support in the written record and therefore must be respected."). While the court is obligated to review the evidence, given the TCA's express reservation of local control, the court also must be sensitive to the difficulties involved in applying inherently policy-based standards such as "in the public interest" to tower-siting decisions. See, e.g., *Sprint Spectrum, L.P. v. Parish of Plaquemines,* No. 01–0520, 2003 WL 193456, at *19–20 (E.D.La. Jan.

---

**3.** The court recognizes another appraiser mentioned three other homes which are within 100 feet of a cell-phone tower. R.137. However, these sites are not in Washington County. Moreover, as indicated above, the court finds it significant that plaintiff's own expert—"[a]fter filtering the number of sites for research," R.269—chose four homes which are at least 350 feet from cell-phone towers as the sites most appropriate for purposes of drawing a comparison to plaintiff's proposed site.

28, 2003) (finding substantial evidence to satisfy the ordinance's "public interest" standard where many residents expressed aesthetic concerns, keeping in mind that even under the TCA " '[l]and use decisions are basically the business of state and local governments' ") (quoting *Am. Tower, L.P. v. City of Huntsville,* 295 F.3d 1203, 1206 (11th Cir.2002)).

▪ In sum, plaintiff does not carry its burden to show the City of Hillsboro's decision was not supported by substantial evidence. The city grounded its decision to deny plaintiff's application in "the specifics of the case," *Todd,* 244 F.3d at 61, not on merely unsupported and vague objections about cell-phone towers in general, as plaintiff contends.[4]

## B. Effective Prohibition

Plaintiff further argues the city's denial effectively prohibits wireless services. Plaintiff specifically argues that because the city's denial was based on general aesthetic concerns, no tower could pass the city's review, since no one would praise the aesthetic virtue of a cell-phone tower. See Plaintiff's Pre–Hearing Memorandum at 17.

▪ The TCA permits a federal court to overturn a local government's zoning decision when the decision has the "effect of prohibiting the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(B)(i). Unlike the substantial evidence inquiry, a district court reviews the record *de novo* to determine whether it supports an effective prohibition claim. *St. Croix,* 342 F.3d at 833; *Nat'l Tower, LLC v. Plainville Zoning Bd. of Appeals,* 297 F.3d 14, 22 (1st Cir.2002).

▪ Most cases have held that a single zoning decision can give rise to an effective prohibition of wireless services. See, e.g., *Second Generation Props., LP v. Town of Pelham,* 313 F.3d 620, 629 (1st Cir.2002) (citing *Town of Amherst v. Omnipoint Communications Enters., Inc.,* 173 F.3d 9, 14 (1st Cir.1999)); *APT Pittsburgh LP v. Penn Township Butler County of Pa.,* 196 F.3d 469, 479–80 (3d Cir.1999); *MetroPCS, Inc.,* 259 F.Supp.2d at 1013; *Airtouch Cellular v. City of El Cajon,* 83 F.Supp.2d 1158, 1167 (S.D.Cal.2000). The Fourth Circuit, however, has held that *only* blanket bans of wireless services implicate the TCA's effective prohibition provision. See *City Council of Va. Beach,* 155 F.3d at 428. The weight of authority, and the more persuasive reasoning, concludes that an effective prohibition can be shown either with a blanket ban or a single decision. As courts have recognized, construing the effective prohibition clause " 'to apply only

---

**4.** Plaintiff argues "[i]f the City had concerns other than aesthetics, those concerns could have been addressed by a conditional approval." See Plaintiff's Pre–Hearing Memorandum at 14–15. Specifically, plaintiff argues, "had the City had lingering concerns over either the lighting requirements or maintaining the large trees bordering the Golden Road location" the city should have conditioned approval on plaintiff's taking measures to alleviate those concerns. *Id.* But because the city's decision was not based on the issue of lighting or trees, the court need not consider this issue. Moreover, plaintiff does not point to evidence in the record showing what, if any, "reasonable conditions" were feasible and that would have effectively alleviated the

city's concerns. See ORS § 197.522 (providing that local government can deny a permit application when it "cannot be made consistent through the imposition of reasonable conditions of approval"). In seeking to overturn the city's decision, the burden is on plaintiff. See *St. Croix,* 342 F.3d at 830; cf. *United States Cellular Tel. of Greater Tulsa, LLC v. City of Broken Arrow,* 340 F.3d 1122, 1137–38 (10th Cir.2003) (" 'We doubt that Congress intended local zoning boards to pay for experts to prove that there are alternative sites for a proposed tower.' ") (quoting *Petersburg Cellular P'ship,* 205 F.3d at 695). In any event, as discussed above, the city's decision is supported by sufficient evidence.

to general bans would lead to the conclusion that, in the absence of an explicit anti-tower policy, a court would have to wait for a series of denied applications before it could step in and force a local government to end its illegal boycott of personal wireless services.'" *St. Croix*, 342 F.3d at 833 (quoting *Sprint Spectrum, LP v. Willoth*, 176 F.3d 630, 640–41 (2d Cir.1999)). Thus the court should consider whether, as plaintiff contends, the city's denial in this case amounts to an effective prohibition.

In invoking the effective prohibition clause, "'the burden for the carrier ... is a heavy one.'" *Second Generation*, 313 F.3d at 629 (quoting *Town of Amherst*, 173 F.3d at 14); see also *MetroPCS*, 259 F.Supp.2d at 1013 (stating a provider challenging a permit denial on effective prohibition grounds "bears a 'heavy' burden of proof").

██ As an initial matter, in determining whether a denial is an effective prohibition, courts have looked to whether the proposed tower would close a "significant gap" in coverage. *St. Croix*, 342 F.3d at 835 n. 7; *Omnipoint Communications Enters., L.P. v. Zoning Hearing Bd. of Easttown Township*, 331 F.3d 386, 397–98 (3d Cir. 2003); *Second Generation*, 313 F.3d at 631. In addition, the provider must show, not just that this permit application was denied, but that further "'reasonable efforts are so likely to be fruitless that it is a waste of time even to try.'" *Second Generation*, 313 F.3d at 629 (quoting *Town of Amherst*, 173 F.3d at 14); accord *St. Croix*, 342 F.3d at 834. Under this standard, the provider must show its "'existing application is the only feasible plan' and ... 'there are no other potential solutions to the purported problem.'" *St. Croix*,

342 F.3d at 834 (quoting *Town of Pelham*, 313 F.3d at 630, 635). Plaintiff cannot meet the applicable standard.

First, plaintiff does not establish its proposed tower would close a "significant gap" in coverage. A significant gap does not exist simply because an area with coverage also has "dead spots" (*i.e.*, "'[s]mall areas within a service area where the field strength is lower than the minimum level for reliable service'"). *Second Generation*, 313 F.3d at 631 (quoting 47 C.F.R. § 22.99). It is undisputed plaintiff's tower would simply improve existing indoor coverage, not fill a complete void in coverage. See, e.g., Plaintiff's Reply Memorandum at 3. This at most appears to be a dead spot. More important, plaintiff does not show "further reasonable efforts are so likely to be fruitless that it is a waste of time even to try." *Second Generation*, 313 F.3d at 629. For instance, the record indicates plaintiff could have achieved its objectives by installing two towers at other locations. R.117, R.513–15. Although the record suggests one of the two alternative towers would be three feet above FAA regulatory limits, R.425, R.517–19, plaintiff does not point to any evidence showing the effect reducing the one tower by three feet would have on service provided by the two-tower alternative. Instead, in response to the FAA regulatory limits, it appears plaintiff submitted a proposal taking into account only *one* proposed tower. R.425, R.575. Such an attempt does not suffice to carry plaintiff's burden to show any further reasonable efforts would be fruitless. Similarly plaintiff does not attempt to show that the proposed tower was the "only feasible plan" or that "there are no other potential solutions to the purported problem." *St. Croix*, 342 F.3d at 834.[5]

---

5. That the possible alternative would have required two towers does not make the Golden Road proposal the only feasible option. Although plaintiff might believe its one-tower alternative is the more attractive option, the

city could have reasonably believed two towers in other locations is better than one tower in the proposed location. See, e.g., *Parish of Plaquemines*, 2003 WL 193456 at *19–20 (not-

And contrary to plaintiff's contention that the city rejected the tower simply because the tower would have been visible to the neighbors, the city based its decision on the specific circumstances presented in the case, not on unsubstantiated general observations equally applicable to any cell-phone tower. In short, plaintiff does not carry its burden to show the city's denial has the effect of prohibiting wireless services.

## C. Discrimination

■ Plaintiff generally contends the city's denial results in unlawful discrimination, because the city previously has granted conditional-use permits for two other wireless-communication facilities in residential areas. Plaintiff speculates that the city denied the Golden Road permit simply because the neighborhood at issue is affluent. Plaintiff contends a municipality should not be permitted to deny a conditional-use application on the sole ground the proposed location is in a neighborhood more affluent than others. While plaintiff's position may be laudable, it points to no evidence showing the city based its decision on the alleged wealth of the residents. As discussed below, plaintiff does not otherwise offer sufficient evidence supporting its argument the city engaged in unreasonable discrimination.[6]

The TCA prohibits zoning boards from unreasonably discriminating "among providers of functionally equivalent services." 47 U.S.C. § 332(c)(7)(B)(i)(I). As with claims under the effective prohibition

clause, there is no deference to the local government's findings. *Airtouch*, 83 F.Supp.2d at 1164 (citing *Cellular Tel. Co. v. Zoning Bd. of Adjustment of Ho–Ho–Kus*, 197 F.3d 64, 71 (3d Cir.1999)).

■ The TCA allows discrimination among providers as long as the discrimination is reasonable. See *Willoth*, 176 F.3d at 638. Plaintiff bears the burden of establishing the city engaged in unreasonable discrimination. See *MetroPCS*, 259 F.Supp.2d at 1011–12. Plaintiff must show "other providers have been permitted to build similar structures on similar sites while it has been denied." *Id.* at 1012 (citing cases). That is, plaintiff must show the city treated a competitor more favorably "for a functionally identical request." *Id.* In determining whether unlawful discrimination occurred, a court must remain mindful that cities retain " 'flexibility to treat facilities that create different visual, aesthetic, or safety concerns differently to the extent permitted under generally applicable zoning requirements, even if those facilities provide functionally equivalent services.' " *Id.* at 1011 (quoting H.R. Conf. Rep. No. 104–458, at 208, *reprinted in* 1996 U.S.C.A.A.N. at 222). Thus a zoning board can treat one provider's application differently from another provider's application based on "traditional bases of zoning regulation." *City of Va. Beach*, 155 F.3d at 427.

Plaintiff does not carry its burden to establish unreasonable discrimination. Plaintiff cites a map showing the city has

---

ing, even though the alternative site would require "two towers at other locations," the city could reasonably prefer "two or more towers" at other locations instead of one tower at the location Sprint chose); see also *Town of Amherst*, 173 F.3d at 15 ("Ultimately, we are in the realm of trade-offs: on one side [is] the opportunity for the carrier to save costs, pay more to the town, and reduce the number of towers; on the other are more

costs, more towers, but possible less offensive sites and somewhat shorter towers.").

6. It is worth noting that plaintiff's argument regarding discrimination, i.e., that other, similar permits have been granted, is at least partially inconsistent with its argument regarding effective prohibition, i.e., that the city is effectively prohibiting wireless services.

approved two other permits for wireless facilities in residential zones. R. 779–81. However, neither this map nor plaintiff establishes any relevant similarity (other than the common zoning designation) between those other two locations and the Golden Road location at issue here. The record shows the other facilities are "at different locations within the [city]." *MetroPCS*, 259 F.Supp.2d at 1012 (holding that a mere showing facilities were permitted in different locations within a district was not "unreasonable discrimination under the Telecommunications Act, as a matter of law"). In fact, the board specifically distinguished the other two sites. See *infra* at 1259–60. Nor does plaintiff show that the two other residential area permits were approved, as in this case, to improve indoor coverage rather than to fill a complete void in coverage. In sum, :

> There is no evidence that the City Council had any intent to favor one company or form of service over another. [Instead] the evidence shows that opposition to the application rested on traditional bases of zoning regulation: preserving the character of the neighborhood and avoiding aesthetic blight. If such behavior is unreasonable then nearly every denial of an application such as this will violate the Act, an obviously absurd result.

*City of Va. Beach*, 155 F.3d at 427.

### III. Conclusion

For the reasons discussed above the court affirms the city's denial of plaintiff's application for a conditional ·use. The city's decision was based on more than a scintilla of evidence, does not effectively prohibit wireless services, and does not discriminate among providers.

IT IS SO ORDERED.